1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR KING COUNTY

| | |
|---|---|
| KERRY L. ERICKSON; MARC D. ERICKSON; MICHELLE M. LEAHY; RICHARD A. LEAHY; JOYCE E. MARQUARDT; and DOES 1-237;<br><br>                        Plaintiffs,<br><br>     v.<br><br>MONSANTO COMPANY, a Delaware corporation; SOLUTIA, INC., a Delaware corporation; PHARMACIA LLC, a Delaware limited liability corporation, f/k/a Pharmacia Corporation; UNION HIGH SCHOOL DISTRICT NO. 402; SNOHOMISH HEALTH DISTRICT; and ROES 1-10;<br><br>                        Defendants. | No.  18-2-11915-4<br><br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION TO THE SKY VALLEY EDUCATION CENTER CASE…...…1

II.  IDENTITY OF THE PARTIES ......................................................................... 3

    A.   Identities of the Defendants ................................................... 3

    B.   Identities of the Plaintiffs ....................................................... 6

III. VENUE AND JURISDICTION ..................................................................... 6

    A.   Venue is proper in King County ............................................ 6

    B.   King County Superior Court has jurisdiction ...................... 7

IV.  COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS ...................... 7

    A.   Plaintiffs complied with the statutory claim notice requirements and waiting periods ................................................................................ 7

    B.   Plaintiffs are not required to give any statutory claim notice to the non-public entity Defendants ................................................................. 7

V.   FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING ...... 7

    A.   Monsanto produced and promoted PCBs from the 1930s to the 1970s ............ 7

    B.   Monsanto's PCBs are "extremely toxic" synthetic chemicals ......................... 9

    C.   Monsanto knew PCBs were toxic, but promoted them without warnings ....... 20

    D.   PCB-caulking and PCB-light ballasts cause PCB-contamination. ................... 31

    E.   The school buildings became toxic, injuring children and adults ................... 45

VI.  LEGAL CONTEXT AND CAUSES OF ACTION .................................................. 89

    A.   State law protects individual rights................................................................... 89

    B.   Plaintiffs are fault-free ...................................................................................... 90

    C.   Negligence claims are covered claims .............................................................. 90

    D.   Defendants' joint and several liabilities............................................................ 90

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

E.      Monsanto Defendants' product liabilities to the Plaintiffs ............................... 90

F.      Public entity negligence. ........................................................................... 98

G.      Roes .......................................................................................................101

H.      Admonition of the *Environmental Defense Fund* decision .............................102

I.      Accountability .........................................................................................102

VII. PRAYERS FOR RELIEF ...................................................................................102

A.      Request for preservation of evidence .........................................................102

B.      Ex parte contact is prohibited ..................................................................102

C.      Limited waiver of physician-patient privilege ..............................................103

D.      Motion practice ......................................................................................103

E.      Judgment for damages ............................................................................103

## I.      INTRODUCTION TO THE SKY VALLEY EDUCATION CENTER CASE

1.1     Monsanto intentionally produced and promoted in the U.S. more than 1.25 billion pounds of synthetic chemicals called Polychlorinated Biphenyls (PCBs). According to U.S. government agencies, PCBs are "extremely toxic" and damage essentially every system of the human body. Since the 1930s, Monsanto has known that PCBs are toxic, yet promoted them without adequate warnings for electrical, construction, and other applications—until they were banned. Internal memoranda, however, show that while Monsanto knew PCBs are toxic, Monsanto made decisions based on PCB profits. As a consequence, PCBs were produced and incorporated into public buildings, including school buildings. Today up to 14 million school children—and their teachers—in U.S. schools may be exposed to PCBs, as estimated by a Harvard School of Public Health study. Monsanto still fails to adequately warn about the extreme toxicity of PCBs.

1.2     In this case, the contaminated school is called Sky Valley Education Center. It contained PCBs and other toxic chemicals, exposing the children and adults who used the buildings. As a result, these individuals have been coping with adverse medical effects, including neurological damage, autoimmune and endocrine diseases, and cancers. The School District building owner and the Health District negligently allowed the toxic chemicals to exist in the school, due in part to Monsanto's ongoing failure to warn about PCBs' extreme toxicity. Regardless, the public entities had duties of reasonable care to provide, maintain, inspect, operate, and supervise the school for the children and adults at Sky Valley. The public entities violated their duties by allowing the toxic chemicals to remain in the school and poison the children and adults, including the teachers.

1.3     This case is about school safety and the toxic chemicals in schools that poisoned children and adults, and whether under state law the manufacturer will be held accountable for its toxic products, and whether the public entities that are obligated to provide safe schools will be held accountable for the toxic school.

1.4     The following EPA slide demonstrates the mechanism of the toxic poisoning:

FIRST AMENDED COMPLAINT FOR DAMAGES - 1



# PCBs - A Complex Problem in Buildings

## Example Scenario

**Primary Sources**
- ● Caulk
- ■ Light Ballast

**Secondary Sources/Sinks**
- Surrounding Materials
- Paint
- Dust

HVAC Unit

- ■ Over 100 PCB chemicals
- ■ Multiple primary sources possible
- ■ Transport from sources to air, surfaces, dust, soil
- ■ Secondary sources created
- ■ Exposures through multiple pathways
- ■ Ventilation and temperature effects

| Ventilation | Primary PCB Source | Secondary PCB Sources and Sinks | Dust/Soil |

**Office of Research and Development**
National Exposure Research Laboratory

## II.    IDENTITY OF THE PARTIES

### A.        Identities of the Defendants.

2.1    In 2015 and 2016, the Cities of Spokane and Seattle and the State of Washington each separately sued the Monsanto Defendants for their role in contaminating Washington public resources with Monsanto's PCBs. Many of the following allegations have been made or admitted to by the State and Monsanto Company, Solutia, Inc., and Pharmacia LCC, through the State's Complaint for Damages, and Monsanto, et al.'s Answer to the Complaint, or are sourced from other public documents. *See* State's Complaint for Damages, *State v. Monsanto, et al.*, King County Case No. 16-2-29591-6-SEA (December 16, 2016), and Defendant Monsanto Company et al.'s Answer to Complaint, *State v. Monsanto Company, et al.*, No. 2:17-cv-00053 (W.D. Wash. Jan. 12, 2017); *see also City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1100, fn 2 (W.D. Wash. 2017) ("The original Monsanto Company operated within three main industries: agricultural products, chemical products, and pharmaceuticals. In the late 1990s, Monsanto Company spun off into three separate corporations, each responsible for a different industry: Monsanto Company retained the agricultural products business; Solutia, Inc. assumed the chemical products business; and Pharmacia Corporation assumed the pharmaceutical business. Each assumed certain assets and liabilities from the original Monsanto Company, and all are defendants in this case"); *City of Spokane v. Monsanto Co.*, Case No. 2:15-cv-00201-SMJ (E.D. Wash. July 31, 2015); *see also Solutia, Inc. v. McWane, Inc.*, 726 F.Supp.2d 1316, 1318-19 (N.D. Ala. 2010) ("Monsanto Company and its predecessors produced polychlorinated biphenyls ('PCBs')... In 1997, Monsanto created Solutia in a spin-off transaction... In 2000, Pharmacia was formed by the merger of Monsanto and Pharmacia & Upjohn").

2.2    Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis County, Missouri.

2.3    Defendant Solutia, Inc. is a Delaware corporation with its principal place of business in St. Louis County, Missouri.

FIRST AMENDED COMPLAINT FOR DAMAGES - 3

2.4    Defendant Pharmacia LLC is formerly known as Pharmacia Corporation and is successor to the original Monsanto Company. Pharmacia is a Delaware limited liability corporation and is a citizen of the states of New York and Delaware. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

2.5    The original Monsanto Company ("Old Monsanto") operated agricultural, chemical, and pharmaceutical businesses.

2.6    Old Monsanto began manufacturing PCBs around the 1930s and continued to manufacture commercial PCBs, including PCBs used in electrical equipment applications such as light ballasts, through the 1940s, 1950s, 1960s, and 1970s, until approximately 1977.

2.7    Around 1997, Old Monsanto spun-off its chemical business to Solutia. Since 2000, the present or current Monsanto Company has operated the agricultural business, while Pharmacia retained the pharmaceutical business.

2.8    Old Monsanto is now known as Pharmacia LLC.

2.9    Old Monsanto organized Solutia to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemical business.

2.10    Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Monsanto, Solutia, and Pharmacia have also entered into agreements to share or apportion liabilities, and/or to indemnify one or more entities, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs.

2.11    According to Monsanto, Solutia, and Pharmacia, the three entities have entered into complex corporate transactions and agreements that determine their respective legal or financial obligations for claims arising from Old Monsanto's manufacture and sale of PCBs.

2.12    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and new Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business.

2.13    Monsanto represented in a recent Form 10-K (for the fiscal year ending August 31, 2016): "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings to which its former parent, Pharmacia LLC ('Pharmacia') or its former subsidiary, Solutia, Inc. ('Solutia') is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities." The document specifies that the company holds $545,000,000.00 in that reserve.

2.14    For the Monsanto Defendants' wrongdoing that lead to PCB contamination and toxic poisonings at the school buildings in this case, Monsanto, Solutia, and Pharmacia are liable to the Plaintiffs under state tort law. These Defendants may be obligated to one another in contract for PCB tort liabilities as set out in their complex corporate agreements, but that is not the subject of this lawsuit. For purposes of this Complaint, these Defendants are referred to as "Monsanto."

2.15    Monsanto's conduct is a legal cause of damages to the Plaintiffs because the Sky Valley Education Center school buildings never would have become contaminated with "extremely toxic" PCBs if Monsanto had not intentionally produced and promoted PCBs in building construction applications.

2.16    Union High School District No. 402 is a Washington school district ("School District").

2.17    According to tax accessor records, Union High appears as the owner of the land and school buildings formerly known as Monroe High School (1950-1977), Monroe Junior High (1977-1987), Monroe Middle School (1987-2011), and now known as the

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Sky Valley Education Center (2011-present), located at 351 Short Columbia Street at Hill and Kelsey Streets, in Monroe. In this Complaint, this location may be referred to as Sky Valley Education Center, Sky Valley, or the school buildings.

2.18   The Snohomish Health District ("Health District") is a Washington independent special purpose district. It is the municipal corporation responsible for public health in Snohomish County, in part by inspecting and enforcing minimal environmental safety requirements in educational facilities, including the school buildings in this case.

**B.   Identities of the Plaintiffs.**

2.19   The Plaintiffs are residents of the State of Washington.

2.20   Plaintiffs Kerry Erickson, Michelle Leahy, and Joyce Marquardt were teachers at the Sky Valley school. They were employed by non-party Monroe School District. Due to the Defendants' wrongful conduct, the teachers were exposed to toxic chemicals and have suffered adverse medical consequences.

2.21   Plaintiffs Marc Erickson and Richard Leahy are spouses of teachers who were exposed to toxic chemicals at the school.

2.22   The Plaintiffs were harmed due to the corporate and governmental wrongdoing of the Defendants. The Plaintiffs bring claims against the Defendants for products liability and negligence. The Plaintiffs bring claims for personal injuries as well as societal and consortium injuries to their spouses.

**III.   VENUE AND JURISDICTION**

**A.       Venue is proper in King County.**

3.1   King County venue is proper because one or more of the Monsanto Defendants transacts business in King County, including Monsanto, Solutia, and/or Pharmacia. RCW 4.12.025(1).

3.2   King County venue is also proper to the extent any Defendant alleges legal fault to a third-party corporate resident of King County. Such corporation may be cross-claimed against or added in an amended complaint by Plaintiffs.

3.3   King County venue is also proper to the extent any Defendant alleges legal

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

fault to third-party Snohomish County and if the County becomes a party.

**B.    King County Superior Court has jurisdiction.**

3.4    This Court has jurisdiction over this case. Wash. Const. Art. 4, §6; RCW 2.08.010; RCW 4.12.020(3).

## IV.    COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS

**A.    Plaintiffs complied with the statutory claim notice requirements and waiting periods for the following public entity Defendants:**

4.1    Union High School No. 402; and

4.2    Snohomish Health District.

**B.    Plaintiffs are not required to give any statutory claim notice to the following non-public entity Defendants:**

4.3    Monsanto Company;

4.4    Solutia, Inc.; or

4.5    Pharmacia LLC, f/k/a Pharmacia Corporation.

## V.    FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING

**A.    Monsanto produced and promoted PCBs from the 1930s to the 1970s.**

5.1    Polychlorinated biphenyls, or "PCBs," are mixtures of synthetic organic chemicals comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). U.S. EPA. PCBS: CANCER DOSE-RESPONSE ASSESSMENT AND APPLICATION TO ENVIRONMENTAL MIXTURES (1996) at 1. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/P-96/001F, 1996, available at https://cfpub.epa.gov/ncea/risk/recorddisplay.cfm?deid=12486 (last accessed November 6, 2017). "Different mixtures can take on forms ranging from oily liquids to waxy solids." *Id.*

5.2    PCBs are comprised of many similar semi-volatile chemicals called congeners. A "PCB congener" is any single, unique chemical compound in the PCB category. Two hundred nine congeners have been identified.

FIRST AMENDED COMPLAINT FOR DAMAGES - 7

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

5.3     From approximately the 1930s to 1977, Monsanto was the only manufacturer in the United States that intentionally produced and promoted PCBs for commercial use. *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1281 fn 37 (1980) ("From the sparse legislative history of § 6(e), it also appears that Congress focused its attention on the deliberate use, manufacture, and distribution of PCBs. Throughout the congressional debate, members of Congress referred to Monsanto Company as the sole producer of PCBs. *See* 122 Cong.Rec. 8294 (1976), reprinted in Legislative History, *supra* note 7, at 240 (Senator Tunney, speaking in support of the section, referred to Monsanto as the "sole domestic manufacturer of PCB's"); *id*. at 27187, reprinted in Legislative History, *supra* note 7, at 588 (Congressman Leggett, speaking in support of the corresponding section in the House bill, referred to Monsanto as "the only American manufacturer of PCB's").") *See also* 116 Cong. Record 11,695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned....") and 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co....."); *and see* Sky Valley Complaint, **Exhibit A** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-1 (E.D. Wash. July 31, 2015), Bates Nos. MONS 058730-058752, entitled "PCB Presentation to Corporate Development Committee") at MONS 058733 (identifying other producers as "all ex-USA").

5.4     The most common trade name for PCBs in the United States is "Aroclor." 21 CFR § 500.45(a) ("Polychlorinated biphenyls (PCBs) represent a class of toxic industrial chemicals manufactured and sold under a variety of trade names, including Aroclor (United States)").

5.5     Aroclor is a name that was trademarked by Monsanto.

5.6     "Between 1929 and 1977, more than 1.25 billion pounds of PCBs were produced in the United States." Agency for Toxic Substances and Disease Registry (ATSDR). 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity. Atlanta, GA: U.S. Department of Health and Human Services, at 21,

available at https://www.atsdr.cdc.gov/csem/csem.asp?csem=30&po=10, last visited on November 7, 2017.

**B.   Monsanto's PCBs are "extremely toxic" synthetic chemicals.**

5.7    "PCBs are extremely toxic to humans and wildlife." *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270 (D.C. Cir. 1980).

5.8    PCBs are a "keystone pollutant" and "a prime motivator for the enactment of TSCA," the Toxic Substances Control Act. "By most accounts, PCBs are the archetypical chemical villains against which the contemporary pollution laws are directed." William H. Rodgers, Jr. and Elizabeth Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (internal citations omitted).

5.9    By the late 1970s, the United States banned the "manufacture, processing, distribution in commerce, and use of polychlorinated biphenyls (PCBs)." 44 Fed. Reg. 31514 (May 31, 1979). The ban remains in effect. "The TSCA prohibits the manufacture, processing, distribution, and use (other than in a 'totally enclosed manner') of polychlorinated biphenyls (PCBs) unless the EPA determines that the activity will not result in an 'unreasonable risk of injury to health or the environment.'" *General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) (holding that an EPA-issued guidance document was a legislative rule requiring prior notice and opportunity for public comment), citing 15 U.S.C. § 2605(e) (2) & (3).

5.10    PCBs are "among the most stable chemicals known and decompose very slowly once they are in the environment... In the environment, **PCBs are toxic at low concentrations to a wide variety of species**, marine mammals included. Once PCBs reach the environment, they tend to stay there, or move slowly in damaging cycles…" William H. Rodgers, Jr. and Elizabeth Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (emphasis added), citing in part Response to Exemption Petitions, 50 Fed. Reg. 35,184 (August 29, 1985) ("**PCBs are also toxic to mammals at very low exposure levels.** The survival rate and reproductive success of fish can be

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA  98101
(206) 501-4446

adversely affected in the presence of PCBs. Various sublethal physiological effects attributed to PCBs have been recorded in the literature") (emphasis added); *see also* 21 CFR § 500.45(a) ("Since PCBs are toxic chemicals, the PCB contamination of food as a result of these and other incidents represent a hazard to public health.").

5.10.1 "For humans, exposures cause acute effects such as skin rashes, vomiting, abdominal pain, and temporary blindness and are suspected of causing birth defects, miscarriages, and cancer." William H. Rodgers, Jr. and Elizabeth Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (internal citations omitted). *See also Solutia, Inc. v. McWane, Inc*., 726 F. Supp. 2d 1316, 1319 (N.D. Ala. 2010) ("PCBs have been found to cause cancer, decreased fertility, still births, and birth defects in test animals.") (Monsanto cleanup contribution case), citing *Dickerson, Inc. v. United States,* 875 F.2d 1577, 1579, 1583 (11th Cir.1989) ("PCBs are highly toxic chemicals frequently used in electrical transformers... Scientists have found PCB concentrations far below those involved in this case to cause cancer, decreased fertility, still births, and birth defects in test animals.") (affirming judgment against the United States for PCB liability). Both *Solutia, Inc.* and *Dickerson* cited *Environmental Defense Fund v. Environmental Protection Agency,* 636 F.2d 1267 (D.C. Cir. 1980), *infra.*

5.11    The *Environmental Defense Fund* decision summarized research available to the scientific community by the late 1970s:

> Polychlorinated biphenyls (PCBs) have been manufactured and used commercially for fifty years for their chemical stability, fire resistance, and electrical resistance properties. They are frequently used in electrical transformers and capacitors. However, PCBs are extremely toxic to humans and wildlife. The extent of their toxicity is made clear in the EPA Support Document accompanying the final regulations, in which the EPA Office of Toxic Substances identified several adverse effects resulting from human and wildlife exposure to PCBs.
>
> Epidemiological data and experiments on laboratory animals indicate that exposure to PCBs pose carcinogenic and other risks to humans. Experimental animals developed tumors after eating diets that included concentrations of PCBs as low as 100 parts per million (ppm). Experiments on monkeys indicate that diets with PCB concentrations of less than ten

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

ppm reduce fertility and cause still births and birth defects. Other data show that PCBs may adversely affect enzyme production, thereby interfering with the treatment of diseases in humans. Support Document, *supra* note 4, at 9-18.

EPA has found that PCBs will adversely affect wildlife as well as humans. Concentrations below one ppb (part per billion) are believed to impair reproductivity of aquatic invertebrates and fish. Some birds suffered "severe reproductive failure" when fed diets containing concentrations of only ten ppm of PCBs. *Id*. at 19. Because PCBs collect in waterways and bioaccumulate in fish, fish-eating mammals run a special risk of adverse effects. Such mammals may have "significantly higher concentrations of PCBs in their tissues than the aquatic forms they feed on." *Id*. at 36.

EPA estimates that by 1975 up to 400 million pounds of PCBs had entered the environment. Approximately twenty-five to thirty percent of this amount is considered "free," meaning that it is a direct source of contamination for wildlife and humans. The rest, "mostly in the form of industrial waste and discarded end use products, is believed to be in landfill sites and thus constitutes a potential source of new free PCBs." *Id*. at 33-34. Other significant sources of PCBs include atmospheric fallout and spills associated with the use or transportation of PCBs. *Id*. at 29.

EPA concluded in the Support Document that "the additional release of PCBs" into the environment would result in widespread distribution of the PCBs and "will eventually expose large populations of wildlife and man to PCBs." *Id*. at 36-37. EPA concluded further that:

> As a practical matter, it is not possible to determine a "safe" level of exposure to these chemicals. Because PCBs are already widely distributed throughout the **\*1271** biosphere, they currently pose a significant risk to the health of man as well as that of numerous other living things. As a consequence, any further increase in levels of PCBs in the biosphere is deemed undesirable by EPA.

*Id*. at 38. Because "PCBs released anywhere into the environment will eventually enter the biosphere ... EPA has determined that any such release of PCBs must be considered 'significant.'" *Id*.

In 1972, Monsanto, the major American manufacturer of PCBs, limited its sales of PCBs to manufacturers of transformers and capacitors. It ceased all manufacture of PCBs in 1977 and shipped the last of its inventory before

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

the end of that year. Today, PCBs are produced in this country only as incidental byproducts of industrial chemical processes. There are no known natural sources of PCBs. *Id*. at 2.

*Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270-71 (D.C. Cir. 1980) (holding, in part, that there was no substantial evidence to support EPA's decision to establish a regulatory cutoff below 50 ppm).

5.12    The decision made other findings: "Most importantly, EPA expressly found that any exposure of PCBs to the environment or humans could cause adverse effects." *Environmental Defense Fund*, 636 F.2d at 1283-84.

5.13    **Closed PCB systems develop leaks.** Another issue in the decision related to the regulation of non-enclosed uses of PCBs, such as "carbonless paper, paints, coatings, soaps, and copying ink toners," versus so-called "totally enclosed uses" of PCBs such as "transformers, capacitors, and electromagnets." *Environmental Defense Fund*, 636 F.2d at 1285. The court ruled against the EPA on this artificial distinction because of something that is also true in this case: "put simply, closed systems develop leaks." *Id.* at 1285; *see also* 1286 (witness "recognized that environmental losses can occur through accidental rupture or leakage.").

5.14    In the years following the ban, the EPA confirmed that PCBs are toxic, may cause reproductive and developmental effects, and may cause tumors ("oncogenic potential") in people exposed:

*Health effects.* EPA has determined that PCBs are toxic and persistent. PCBs can enter the body through the lungs, gastrointestinal tract, and skin, circulate throughout the body, and be stored in the fatty tissue.

Available animal studies indicate an oncogenic potential, the degree to which would depend on exposure… Further epidemiological research is needed to correlate human and animal data, but EPA finds no evidence to suggest that the animal data would not predict an oncogenic potential in humans.

In addition, EPA finds that PCBs may cause reproductive effects, developmental toxicity, and oncogenicity in humans exposed to PCBs. Available data show that some PCBs have the ability to alter reproductive

FIRST AMENDED COMPLAINT FOR DAMAGES - 12

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

processes in mammalian species, sometimes even at doses that do not cause other signs of toxicity. Animal data and limited available human data indicate that prenatal exposure to PCBs can result in various degrees of developmental toxic effects. Postnatal effects have been demonstrated in immature animals following exposure to PCBs prenatally and via breast milk.

In some cases chloracne may occur in humans exposed to PCBs. Severe cases of chloracne are painful and disfiguring, and symptoms may persist for an extended time…

50 Fed. Reg. 35182, 35183-84 (August 29, 1985).

5.15   The EPA also determined that Monsanto's PCBs are probable human carcinogens. In 1996, the EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260. The EPA's cancer reassessment was peer reviewed by experts on PCBs, including scientists from government, academia, and industry. U.S. EPA. PCBs: Cancer Does-Response Assessment and Application to Environmental Mixtures (1996). U.S. EPA, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/P-96/001F, 1996, available at https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=12486 (last accessed November 6, 2017).

5.16   This EPA report found that "[j]oint consideration of cancer studies and environmental processes leads to a conclusion that environmental PCB mixtures are highly likely to pose a risk of cancer to humans." *Id.* at 57. In addition, "PCBs persist in the body, providing a continuing source of internal exposure after external exposure stops. There may be greater-than-proportional effects from less-than-lifetime exposure, especially for persistent mixtures and for early-life exposure." *Id.* at 58-59.

5.17   The 1996 EPA report also noted that "PCBs also have significant ecological and human health effects other than cancer, including neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption. Toxic effects have been observed from acute and chronic exposures to PCB mixtures with varying chlorine content." *Id.* at vi.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.18    In 2000, the Agency for Toxic Substances and Disease Registry (ATSDR), issued a public health statement regarding PCB exposure. It noted that "[s]kin conditions, such as acne and rashes, may occur in people exposed to high levels of PCBs… Some studies in workers suggest that exposure to PCBs may also cause irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, and depression and fatigue." Agency for Toxic Substances and Disease Registry (ATSDR). 2000. Toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, at 4. The public health statement summarized experimental animal studies finding liver damage, anemia, acne-like skin conditions, stomach injuries, thyroid injuries, kidney damage, impaired immune system function, behavioral alterations, endocrine disruption, and impaired reproduction. *Id.* at 5.

5.19    **Children are more vulnerable to PCB exposure.** The 2000 ATSDR statement also summarized studies tending to show effects in PCB-exposed children: low birthweight; problems with motor skills; decreases in short-term memory; and effects on the immune system. *Id.* at 6. The report noted that children are more vulnerable to PCB exposure than adults, although the routes of exposure are the same:

> Children are exposed to PCBs in the same way as are adults: by eating contaminated food, breathing indoor air in buildings that have electrical devices containing PCBs, and drinking contaminated water. Because of their smaller weight, children's intake of PCBs per kilogram of body weight may be greater than that of adults.
> …
> It is possible that children could be exposed to PCBs following transport of the chemical on clothing from the parent's workplace to the home. House dust in homes of workers exposed to PCBs contained higher than average levels of PCBs. PCBs have also been found on the clothing of firefighters following transformer fires. The most likely way infants will be exposed is from breast milk that contains PCBs. Fetuses in the womb are also exposed from the exposed mother.
> ….
> Because the brain, nervous system, immune system, thyroid, and reproductive organs are still developing in the fetus and child, the effects of PCBs on these target systems may be more profound after exposure during

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

the prenatal and neonatal periods, making fetuses and children more susceptible to PCBs than adults.

*Id.* at 5-6. In addition, "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs." *Id.* at 381.

5.20   **Children are not small adults.** The ATSDR toxicological profile for PCBs reiterated these developmental concerns while cautioning against the fallacy that children possess the same level of resilience to toxic exposure as adults: "Children are not small adults… Children also have a longer remaining lifetime in which to express damage from chemicals; this potential is particularly relevant to cancer." *Id.* at 380-81.

5.21   **Workplace PCB exposure can contaminate homes.** The ATSDR statement reiterated that workplace exposure to PCBs can result in the worker's home becoming contaminated with PCBs: "If you are exposed to PCBs in the workplace, it may be possible to carry them home from work… If this is the case, you should shower and changing clothing before leaving work, and your work clothes should be kept separate from other clothes and laundered separately." *Id.* at 7.

5.22   **PCB exposure and cardiovascular damage.** A 2011 ATSDR addendum to the toxicological profile for PCBs reported on more recent research, including animal studies showing cardiovascular damage following PCB exposure. Agency for Toxic Substances and Disease Registry (ATSDR). 2011. Addendum to the toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S. ATSDR, Division of Toxicology and Environmental Medicine, at 1.

5.23   **PCB exposure and type 2 diabetes.** The 2011 addendum reported research that "PCB exposure was strongly related to prevalence of type 2 diabetes mellitus." *Id.* at 2-3.

5.24   **PCB exposure and deficient immune function.** The 2011 addendum reported research "suggesting possible impaired immunologic development" in children,

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

and the results of another study that "implied that exposure to PCBs is a possible cause of deficient immune function in children." *Id.* at 4.

5.25   **PCB exposure and neurodegenerative diseases.** The 2011 addendum reported other research "that exposure to PCBs likely has an effect on neurodegenerative diseases for women but not men," including amyotrophic lateral sclerosis (ALS, also known as motor neuron disease), Parkinson's disease, and dementia. *Id.* at 4.

5.26   **PCB exposure and neurobehavioral effects, anxiety.** The 2011 addendum reported animal studies research "that exposure to PCBs may exert anxiogenic behavior." *Id.* at 5. An anxiogenic substance is one that causes anxiety.

5.27   **PCB exposure and central nervous system effects.** The 2011 addendum reported animal studies research showing inhibited and depressed central nervous system effects following PCB exposure. *Id.* at 5-6.

5.28   **PCB exposure and children's permanent teeth.** The 2011 addendum reported human studies showing "a dose-response relationship between PCB exposure and development enamel defects of permanent teeth in children." *Id.* at 7.

5.29   **PCB exposure and sexual development.** The 2011 addendum reported human studies research showing impaired sexual development, including a positive association between high total PCB concentrations and cryptorchidism (undescended testicles) in boys. Another study "suggested that even low levels of PCBs had a robust negative impact on gonadal hormones in newborns." *Id.* at 7-8. Another study of girls exposed to PCBs "suggested that even at low levels of estrogenic PCBs, the time to menarche attainment was decreased," and the "median age at menarche for this cohort (138 girls) was 12.2 years." *Id.* at 9. Another study found "that exposure to certain PCB congeners may interfere with human reproductive development" in both boys and girls. *Id.* at 9. Animal studies also found "dose-related prolongation of the estrous cycle in female offspring," and "changes in body weight, body length, tail length, and weights of kidneys, testes, ovaries, and uterus." *Id.* at 9.

5.30   **Broad spectrum of effects.** A 2014 ATSDR publication stated that

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

occupational exposure to PCBs can result in a "broad spectrum of effects that includes increased levels of some liver enzymes, with possible hepatic damage, chloracne and related dermal lesions, and respiratory problems." Agency for Toxic Substances and Disease Registry (ATSDR). 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity. Atlanta, GA: U.S. Depart. of Health and Human Services, at 39, available at https://www.atsdr.cdc.gov/csem/csem.asp?csem=30&po=10, last visited on November 7, 2017. The following information references this 2014 ATSDR publication.

5.31   **Acute exposure to PCBs.** Signs and symptoms of acute exposure to PCBs can include chloracne, eye irritation, nausea, vomiting, and elevated liver enzymes and altered liver function. *Id.* at 55-56.

5.32   **Chronic exposure to PCBs.** Signs and symptoms of chronic exposure to PCBs can include abdominal pain, anorexia, jaundice, nausea, vomiting, weight loss, uroporphyria, headache, dizziness, and edema. *Id.* at 56-57.

5.33   **Toxic responses to PCBs.** Animal studies have shown that "commercial PCBs elicit a broad range of toxic responses including:

- Acute lethality,
- Body weight loss,
- Carcinogenesis,
- Dermal toxicity,
- Fatty liver,
- Genotoxicity,
- Hepatomegaly,
- Immunosuppressive effects,
- Neurotoxicity,
- Porphyria,
- Reproductive and developmental toxicity,
- Thymic atrophy, and
- Thyroid hormone-level alterations."

*Id.* at 39-40.

5.34   **Dermatological effects.** "Conclusive evidence that exposure to PCBs induces adverse dermal effects in humans exists":

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1

2

Chloracne and related dermal lesions have been reported in workers occupationally exposed to PCBs.

…

3

4

5

6

The chin, periorbital, and malar areas are most often involved, although lesions might also appear in areas not usually affected by acne vulgaris (e.g., the chest, arms, thighs, genitalia, and buttocks). The most distinctive lesions are cystic and measure 1-10 mm, although comedonal lesions can also be present.

…

7

8

9

Chloracne generally indicates systemic toxicity and can be caused by not only dermal contact but also ingestion of PCBs… Chloracne typically develops weeks or months after exposure. The lesions are often refractory to treatment and can last for years or decades.

10

11

12

In addition to chloracne, other dermal effects noted some PCB-exposed workers include pigmentation disturbances of skin and nails, erythema and thickening of the skin, and burning sensations.

13

*Id.* at 41-42 (internal citations omitted).

14

15

16

17

18

19

20

21

22

23

24

25

26

5.35   **Reproductive and developmental effects.** "Reproductive function may be disrupted by exposure to PCBs," and "neurobehavioral and development deficits have been reported in newborns exposed to PCBs in utero." *Id.* at 45. Children born to women exposed to PCBs exhibited statistically significant decreases in gestational age, birth weight, and head circumference. *Id.* at 43. Higher levels of PCB exposure correlated with weaker reflexes, greater motor immaturity, and more pronounced startle responses. *Id.* at 43-44. Follow-up studies of the children of that cohort "demonstrated that the effects of perinatal exposure to PCBs are persistent." *Id.* at 44. At four years of age, the children still had deficits in weight gain, depressed responsiveness, and reduced performance on the visual recognition memory test. *Id.* at 44. "At 11 years of age, the children of highly exposed mothers were three times more likely than controls to have low full-scale IQ scores; twice as likely to lag behind at least 2 years in reading comprehension; and more likely to have difficulty paying attention." *Id.* at 44 (internal citation omitted).

27

28

5.36   **Endocrine effects.** "The epidemiological studies suggest a link between exposure to PCBs and thyroid hormone toxicity in humans." *Id.* at 46. "Thyroid hormones are essential for normal behavioral, intellectual, and neurologic development.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Thus, the deficits in learning, memory, and attention processes among the offspring of women exposed to PCBs are partially or predominantly mediated by alterations in hormonal binding to the thyroid hormone receptor." *Id.* "Recent studies in populations exposed to PCBs and chlorinated pesticides found a dose-dependent elevated risk of diabetes." *Id.*

5.37   **Hepatic effects.** "Although liver damage is common in animals exposed to PCBs, overt hepatotoxicity is uncommon in humans. Exposure to PCBs can increase serum levels of hepatic enzymes and can induce microsomal enzyme function." *Id.* at 46-48.

5.38   **Neurological effects.** Adults exposed to PCBs have been shown to have significantly greater motor retardation; poorer results on certain memory and attention tests; and higher scores on standardized confusion scale than did control adults. *Id.* at 51.

5.39   **Additional adverse effects.** "Occupational and epidemiologic studies have suggested or demonstrated other adverse health effects from exposure to PCBs," including cardiovascular, gastrointestinal, genetic, immune, musculoskeletal, and neurological systems. *Id.* at 51-52.

5.40   **Additional signs and symptoms.** The ATSDR "advises patients to consult their physicians if they develop signs or symptoms of PCB exposure such as: appetite loss; joint pain; nausea; skin disorders, changes, or discoloration; breast changes or lumps; and/or stomach distress and pain." *Id.* at 68.

5.41   **Highly toxic PCDDs and PCDFs.** "Occupational exposure to PCBs may be accompanied by exposure to chlorinated dibenzodioxin and dibenzofuran contaminants, which are much more toxic than PCBs in comparative animal studies. These substances can cause chronic fatigue and elevated liver enzymes." *Id.* at 57.

5.42   **PCBs are a "probable human carcinogen."** The Department of Health and Human Services and the Environmental Protection Agency "consider PCBs a probable human carcinogen." *Id.* at 51. In addition, and "on the basis of sufficient evidence of carcinogenicity in humans and experimental animals, the IARC

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

[International Agency for Research on Cancer] classified PCBs as carcinogenic to humans." *Id.* PCB exposure has been linked to cancers of the liver, gallbladder, biliary tract, brain, stomach, intestinal, thyroid, myeloma (cancer of plasma cells, which can damage the bones, immune system, kidneys, and red blood cell count), non-Hodgkin lymphoma (a cancer that starts in the lymphatic system), and the skin, such as malignant melanomas. *Id.* at 48-50. In addition, "data from animal studies have shown that PCBs cause gastrointestinal tract tumors, hepatocarcinomas, leukemia, lymphomas, and pituitary tumors." *Id.* at 50.

5.43   **IARC: "PCBs are carcinogenic to humans."** In 2016, the International Agency for Research on Cancer published an assessment on the carcinogenicity of PCBs. International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 107. Polychlorinated and Polybrominated Biphenyls (2016), available at http://monographs.iarc.fr/ENG/Monographs/vol107/index.php (last accessed November 6, 2017. The IARC report concluded, "There is *sufficient evidence* in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast... PCBs are *carcinogenic to humans.*" *Id.* at 439 (emphasis in original).

5.44   **Wide range of cancers and lesions.** Animal and human studies show associations between PCB exposure and other cancers and lesions not specifically enumerated above. These can include prostate cancer, testicular cancer, pancreatic cancer, lung cancer, mouth cancer, uterine cancer, and non-neoplastic lesions of the liver, thyroid gland, ovary, oviduct, uterus, lung, adrenal cortex, pancreas, kidney, heart, thymus, spleen, clitoral gland, mesenteric artery, oral mucosa, bone marrow, and bladder. *See, e.g.,* Agency for Toxic Substances and Disease Registry (ATSDR). 2011. Addendum to the toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S. ATSDR, Division of Toxicology and Environmental Medicine, at 10-14.

**C.   Monsanto knew PBCs were toxic, but promoted them without warnings.**

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

1   5.45   "Monsanto was well aware of scientific literature published in the 1930s
2   that established that inhalation of PCBs in industrial settings resulted in toxic systemic
3   effects in humans." State of Washington's Complaint for Damages against Monsanto, p.
4   12, ¶ 49, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5   5.46   A 1937 Monsanto memorandum advised that "Experimental work in
6   animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or
7   by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact
8   with the liquid Aroclors may lead to an acne-form skin eruption." *Id.* at ¶ 50; *see Sky*
9   *Valley Complaint*, **Exhibit B** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-
10  00201-SMJ, ECF No. 1-2 (E.D. Wash. July 31, 2015), MONS 061332).

11  5.47   A 1955 memorandum entitled "AROCLOR TOXICITY" by Monsanto
12  Medical Director Emmet Kelly summarized Monsanto's position on PCB toxicity: "We
13  know Aroclors are toxic but the actual limit has not been precisely defined. It does not
14  make too much difference, it seems to me, because our main worry is what will happen if
15  an individual develops any type of liver disease and gives a history of Aroclor exposure. I
16  am sure the juries would not pay a great deal of attention to MACs [maximum allowable
17  concentrates]." State of Washington's Complaint for Damages against Monsanto, p. 12, ¶
18  51, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see* Sky Valley
19  Complaint, **Exhibit C** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ,
20  ECF No. 1-3 (E.D. Wash. July 31, 2015), MONS 095196-97) at 2.

21  5.48   A 1955 "CONFIDENTIAL" memorandum by Monsanto's Medical
22  Department stated that workers should not be allowed to eat lunch in the Aroclor
23  department. Three reasons were provided, including the fact that "Aroclor vapors and
24  other process vapors could contaminate the lunches unless they were properly protected."
25  *See* Sky Valley Complaint, **Exhibit D** (from *City of Spokane v. Monsanto Co.*, Case 2:15-
26  cv-00201-SMJ, ECF No. 1-4 (E.D. Wash. July 31, 2015) at 2.

27  5.49   In addition, after noting that "the chance of contaminating hands and
28  subsequently contaminating the food is a definite possibility," the Medical Department

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

stated that

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because **early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.** In any case where a workman claimed physical harm from any contaminated food, it would be extremely difficult on the basis of past literature reports to counter such claims.

*Id.* (emphasis added); *see also* State of Washington's Complaint for Damages against Monsanto, pp. 12-13, ¶ 52, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.50    A 1957 internal memorandum by Monsanto Medical Director Emmet Kelly reported that, after it conducted its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that [Aroclor-containing] Pydraul 150 is just too toxic for use in a submarine." State of Washington's Complaint for Damages against Monsanto, p. 13, ¶ 53, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see Sky Valley Complaint,* **Exhibit E** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-5 [E.D. Wash. July 31, 2015]) at 2.

5.51    Therefore, by the 1950s, Monsanto knew that its PCBs a/k/a "Aroclors are toxic but the actual limit has not been precisely defined." *Supra* at ¶ V.C.3. Perhaps reflecting on this, Monsanto's Medical Director Kelly made the reasonable observation that "juries would not pay a great deal of attention" to exposure limits set by the industry. *Id.* This is reasonable because so-called exposure limits have not been based on human subject testing, which would be unethical. Instead, the industry extrapolated so-called human exposure limits from laboratory tests of small mammals like rats, guinea pigs, rabbits, and dogs, who have a limited ability to report or demonstrate complaints following PCB exposure before dying—or being killed—and then dissected for the pathological examination of lesions. *See, e.g.,* **Exhibits L** and **R**. Regardless, Monsanto

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

also knew that "early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation." *Supra* at ¶ V.C.5.

5.52    In 1966 or 1967, Monsanto Medical Director Emmet Kelly reviewed a scientific presentation by University of Stockholm researcher Soren Jensen, who stated that PCBs "appear to be the most injurious chlorinated compounds of all tested." *See* Sky Valley Complaint, **Exhibit F** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-6 [E.D. Wash. July 31, 2015]), at JDGFOX00000038 (at bottom). Researcher Jensen referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible." *Id.* at JDGFOX00000039. Monsanto Medical Director Kelly did not dispute the researcher's remarks, noting in the 1967 letter to the Research Division of National Cash Register, that "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses." *Id.* at JDGFOX00000037; *see also* State of Washington's Complaint for Damages against Monsanto, p. 13, ¶ 54, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016). Medical Director Kelly did not define the term "large doses."

5.53    By the latter half of the 1960s, Monsanto became aware that PCBs were causing widespread contamination of the environment. *See* Sky Valley Complaint, **Exhibits G, H,** and **L** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-7, 1-8, 1-13 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 14, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.54    Despite the growing evidence of harm caused to living things by PCB contamination, Monsanto remained steadfast in its production of PCBs. *See* State of Washington's Complaint for Damages against Monsanto, p. 19, ¶ 60, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.55    In March of 1969, Monsanto employee W.M. Richard wrote a memorandum entitled "AROCLOR WILDLIFE ACCUSATIONS" to Monsanto

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

employee Elmer Wheeler. *See* Sky Valley Complaint, **Exhibit I** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-9 [E.D. Wash. July 31, 2015]), Bates No. MONS 096509-11. In the memorandum, Richard responded to a 1968 article in *Nature* criticizing PCBs as being (in Richard's paraphrasing) "a pollutant… a toxic substance—with no permissible allowable levels… [and] a toxic substance endangering man himself, implying that the [extinction] of the peregrine falcon is a leading indicator of things to come." *Id.* at MONS 096509. Richard also responded to a 1969 article in *Science* regarding the Environmental Defense Fund's legal strategy, which Richard summarized in part by writing that

> These people at EDF are saying we must not put stress on any living thing through a change in air or water environment. Eagles, plant life, anything which lives or breathes. This group is pushing hard on the extension of the word harmful. They claim <u>'enzyme inducer' activity is the real threat</u> of DDT and PCB's and are using these arguments to prove that very small amounts of chlorinated hydrocarbons are 'harmful.'

*Id.* (emphasis in original). Richards also explained that Monsanto could take steps to reduce PCB releases from its own factories, but he cautioned that "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In these applications, exposure to consumers is greater and the disposal problem becomes complex." *Id.* at MONS 096510; *see also* State of Washington's Complaint for Damages against Monsanto, pp. 14-15, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.56   During this time period, "the coordination of the Division effort has been principally the responsibility W.R. Richard and E.P. Wheeler with support from R.E. Keller and Cumming Paton." *See* Sky Valley Complaint, **Exhibit M** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-13 [E.D. Wash. July 31, 2015]), Bates No. DSW 014623.

5.57   In September of 1969, Monsanto employee W.R. Richard wrote an interoffice memorandum entitled "DEFENSE OF AROCLOR." *See* Sky Valley

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Complaint, **Exhibit J** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-10 [E.D. Wash. July 31, 2015]), Bates No. DSW 014256-63. The memorandum set out Monsanto's general policy on defending litigation against the public: "Make the Govt., States and Universities prove their case." The memorandum acknowledged, however, that Monsanto

> can't defend vs. everything. **Some animals or fish or insects will be harmed.** Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately.

*Id.* at DSW 014256 (emphasis added). Based on this, Monsanto knew by the late 1960s that "some animals or fish or insects will be harmed" in the general environment, where PCB contamination is low and diffuse—as opposed to PCB contamination in a more enclosed space such as a classroom, as shown below. The 1969 memorandum also outlined Monsanto's plans for challenging scientific studies of the toxicity of PCBs:

```
Monsanto Prove Bioharmless - Limited work at Ind. Bio-test -

   "Safe" toxic  / man              Rats      Seek evidence of Biodegra
   level for    { mammals via       Chickens              dation
                 \ fish             Fish      Question evidence against
                                                       us.
                                              Question shrimp toxicology
                                               especially other toxic
                                               chemicals.
                                              If Aroclor bad, others
                                               must be worse.

Probable Outcome

We can prove some things are OK at low concentration.
Give Monsanto some defense.
```

*Id.* at DSW 014256. The memorandum also outlined Monsanto's own plans for chronic toxicity studies using animals. *Id.* at DSW 014262-63; *see also* State of Washington's Complaint for Damages against Monsanto, p. 15, ¶ 60, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

    5.58   In January of 1970, Elmer Wheeler of Monsanto's Medical Department

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

circulated laboratory results of its animal studies. The memorandum was entitled "Status of Aroclor Toxicological Studies." *See* Sky Valley Complaint, **Exhibit K** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-11 [E.D. Wash. July 31, 2015]), Bates No. MONS 098480. Wheeler stated, "Our interpretation is that **the PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.** Secondly, although there are variations depending on species of animals, the PCBs are about the same as DDT in mammals." *Id.* (emphasis added).

5.59    Monsanto expressed a desire to keep profiting from PCBs despite the research showing PCB toxicity. *See* Sky Valley Complaint, **Exhibit A**. In the "PCB Presentation to Corporate Development Committee," Monsanto stated that "Do[ing] nothing was considered unacceptable from a legal, moral, customer, public relations & company policy viewpoint." *Id.* at MONS 058737. But the alternative of stopping PCB production and promotion, and instead going out of the Aroclor business, "was considered unacceptable from a Divisional viewpoint… there is too much customer/market need and selfishly too much Monsanto profit to go out." *Id.*

5.60    Monsanto formed an internal Aroclor Ad Hoc Committee whose objectives, "agreed to by the Committee," were to "submit recommendations for action which will: 1. Permit continued sales and profits of Aroclors and Terphenyls. 2. Permit continued development of uses and sales. 3. Protect image of Organic Division and of the Corporation." State of Washington's Complaint for Damages against Monsanto, pp. 15-16, ¶ 62, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see* Sky Valley Complaint, **Exhibit L** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-12 [E.D. Wash. July 31, 2015]), Bates No. MONS 030483-86 ("CONFIDENTIAL MINUTES OF AROCLOR 'AD HOC' COMMITTEE"). Monsanto set these business objectives despite knowing that PCBs had been found in the environment, wildlife, and the food chain, as PCBs "may be a global contaminant." *Id.* In these confidential minutes, Monsanto recognized the problem of PCB "environmental contamination by customers." *Id.* at MONS 030485 ("Our in-plant problems are very

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

small vs. problems of dealing with environmental contamination by customers.").

5.61    In October of 1969, Monsanto's Aroclor "Ad Hoc" Committee issued its confidential report. *See* Sky Valley Complaint, **Exhibit M** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-13 [E.D. Wash. July 31, 2015]), Bates No. DSW 014612-24. The committee reported environmental PCB contamination causing the killing of marine species and the possible extinction of several species of birds. *Id.* at DSW 014615. In addition, "the committee believes that there is no ~~possible~~ practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination." *Id.* (underscore and strikethrough in original). The report outlined a plan to protect Monsanto's corporate interests: "There are, however a number of ~~possible~~ actions which must be undertaken in order to prolong the manufacture, sale, and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." *Id.* (strikethrough and underscore in original).

5.62    The committee offered recommendations, including notifying PCB "customers of environmental contamination problems." *Id.* at DSW 014616. The basis for the recommendation, in part, concerned reports of PCB environmental contamination and Monsanto's knowledge of the mechanisms of PCB releases:

> It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.
>
> It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.
>
> Another possible source of air environmental contamination is the eventual destruction of materials which have Aroclors in them. Of particular significance might be the burning or partial incineration of waste or used products containing the Aroclors.

1   *Id.* at DSW 014618.

2   5.63   Despite the environmental damage caused by its PCB products, Monsanto

3   was clearly concerned about losing the production of PCBs and the associated "sales of

4   this very profitable series of compounds":

<u>Budgetary Considerations</u>

The committee recognizes the restrictions placed on
those currently involved by mandates to operate
within normal or proposed reduced budgets.   It
should be clear, however, that the product groups,
the Division and the Corporation are faced with
an extraordinary situation.   There can not be too
much emphasis given to the threat of curtailment
or outright discontinuance of the manufacture and
sales of this very profitable series of compounds.
If the products, the Division and the Corporation
are to be adequately protected, adequate funding
is necessary.

14   *Id.* at DSW 014624.

15   5.64   Therefore, by 1970, the escape of PCBs into surrounding environments and

16   the resulting contamination was not only reasonably foreseeable, but the problem was

17   known to Monsanto. In addition, the escape of Monsanto's PCBs *by PCB customers and*

18   *users* into surrounding environments was not only reasonably foreseeable, but was known

19   to Monsanto. *See also* State of Washington's Complaint for Damages against Monsanto,

20   pp. 23-24, ¶ 99, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

21   5.65   By 1970, Monsanto also knew that its PCBs exhibited a greater degree of

22   toxicity than Monsanto previously anticipated. *Supra* at ¶ V.C.14.

23   5.66   Despite this knowledge, Monsanto chose not to warn its customers and the

24   public regarding the human health dangers of Monsanto's PCBs. Any statements made

25   by Monsanto in that regard have been insufficient to convey the actual dangers posed by

26   PCBs. Instead, Monsanto's efforts were and continue to be focused on protecting its own

27   profits.

28   5.67   An interoffice memorandum circulated in February of 1970 that provided

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

talking points for discussions by Monsanto representatives with PCB customers. Monsanto informed its PCB representatives that Monsanto "can't afford to lose one dollar of business." To that end, Monsanto stated, "We want to avoid any situation where a customer wants to return fluid… We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." *See* Sky Valley Complaint, **Exhibit N** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-14 [E.D. Wash. July 31, 2015]), at 2 (emphasis in original); *see also* State of Washington's Complaint for Damages against Monsanto, p. 17, ¶ 67, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.68   In roughly this same time period, Monsanto advised public officials that Monsanto's PCBs "are not particularly toxic by oral ingestion or skin absorption" and "infrequent exposure to PCB vapor should not cause ill effects." *See* Sky Valley Complaint, **Exhibits O** and **P** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-15, 1-16 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 20, ¶ 76, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016) ("While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly mispresented these facts, telling governmental entities the exact opposite— that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.").

5.69   Monsanto also offered the message to a member of Congress that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion." *See* Sky Valley Complaint, **Exhibits Q** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-17 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 21, ¶ 79, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

5.70   Monsanto also represented to another governmental official that "Based on available data, manufacturing and use experience, we do not believe the polychlorinated biphenyls to be seriously toxic." *See* Sky Valley Complaint, **Exhibit R** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-18 [E.D. Wash. July 31, 2015]) at 3; *see also* State of Washington's Complaint for Damages against Monsanto, p. 21, ¶ 80, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.71   Clearly, Monsanto's knowledge of PCB toxicity deepened between the 1930s and the 1970s. Despite its knowledge of PCB toxicity, Monsanto intentionally produced and promoted PCBs "for use in a wide range of industrial and household goods, including electrical equipment, paint, sealants, food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers, asphalt, leather adhesive, and stucco." *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1100 (W.D. Wash. 2017).

5.72   "Though Monsanto was aware of PCBs' toxicity and propensity to leach, it denied or misrepresented those facts to government investigators. Monsanto continued to manufacture, promote, and profit from its PCBs." *Id.* (internal citations omitted) (holding that Seattle's claims against Monsanto for public nuisance and equitable indemnity are not preempted by Washington's Product Liability Act (WPLA); Seattle's common law product liability claims are not preempted by WPLA to the extent they arose on or before 1981; Seattle's claims are not time-barred; **Seattle stated a claim for public nuisance, the court rejecting Monsanto's argument that any intervening acts of third parties cut off proximate causation, because such acts were foreseeable**; Seattle lacked standing to bring product liability claims; Seattle stated a claim for negligence; and Seattle failed to allege facts supporting its claim for equitable indemnity).

5.73   Monsanto intentionally failed to warn customers and the public regarding the toxicity and hazards of its PCB products. *See, e.g., Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306-07 (9th Cir. 1992) ("Nevada Power discovered internal documents of the Manufacturers which Nevada Power contends show that the Manufacturer's understanding of the dangers of PCBs in the 1960s and early 1970s was

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

much more advanced than the general state of knowledge in the scientific community")
(holding, in part, that it was a fact question as to whether Nevada Power's fraud and
failure to warn claims were barred by the Nevada statute of limitations).

5.74    Monsanto's PCBs were not reasonably safe in construction because they
were unsafe—"extremely toxic"—to an extent beyond that which would be contemplated
by an ordinary consumer. The extreme toxicity of Monsanto's PCBs was a proximate
cause of Plaintiffs' damages.

5.75    Monsanto's PCBs were not reasonably safe as designed under a balancing
test or under a consumer expectations test, which was a proximate cause of Plaintiffs'
damages.

5.76    Monsanto's PCBs were an unavoidably unsafe product, which was a
proximate cause of Plaintiffs' damages.

5.77    Monsanto's PCBs were not reasonably safe due to inadequate warnings
when manufactured or after manufacture.

5.78    Any Monsanto warnings to the non-Monsanto parties in this case at the
time of manufacture regarding the extreme toxicity of PCBs, were inadequate and a
proximate cause of Plaintiffs' damages.

5.79    Any Monsanto warnings to the non-Monsanto parties in this case after
manufacture—and up to the present day—regarding the extreme toxicity of Monsanto's
PCBs, have been inadequate, which was a proximate cause of Plaintiffs' damages.

5.80    Due to their extreme toxicity, Monsanto's PCBs never had a "useful safe
life."

5.81    Monsanto had actual knowledge of the defect and the danger of its PCBs,
but showed complete indifference or conscious disregard for the safety of others by
producing and promoting PCBs anyway.

**D.    PCB-caulking and PCB-light ballasts cause PCB-contamination.**

5.82    Monsanto manufactured PCBs that were incorporated by Monsanto's
customers as plasticizers in caulking, paints, and sealants. In these forms, Monsanto's

FIRST AMENDED COMPLAINT FOR DAMAGES - 31

PCBs were used in interior and exterior windows, doors, and masonry joints.

5.83     Even today, caulking with high PCB levels are usually still flexible and often largely intact.

5.84     PCB-caulking emits PCBs, which migrate into the air and nearby materials, including adjoining wood, cement, and brick; air and dust inside schools; soil near school buildings, and other materials and furnishing.

5.85     The following information comes from a publication of the United States Environmental Protection Agency (2014, pp. 7-9). Thomas, K. (2014). PCBs in school buildings: sensible steps to healthier school environments. Washington, DC: U.S. EPA Office of Research and Development.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446



# PCB Sources – Caulk and Other Sealants







➢ U.S. Production of Aroclors as a plasticizer ingredient

- 1958 - 4 million lbs.
- 1969 - 19 million lbs.
- 1971 – 0 lbs.

➢ PCBs were sometimes added to caulk during construction

➢ Used for

- Exterior and interior windows and doors
- Exterior and interior joints
- Window glazing
- Other locations/seams (plumbing, casework, etc.)

➢ Caulk with PCBs > 50 parts per million (ppm) is not an allowed use

FIRST AMENDED COMPLAINT FOR DAMAGES - 33

# PCB Sources – Caulk and Other Sealants









➢ In several northeastern schools:

- 18% of 427 interior caulk/sealant samples >50 ppm PCBs
- 6% of interior samples >100,000 ppm (10% by weight)

- 63% of 73 exterior caulk/sealant samples >50 ppm PCBs
- 34% of exterior samples >100,000 ppm

- Highest level was 440,000 ppm PCBs (44% by weight)

➢ We have found that caulk with high PCB levels is usually still flexible and often largely intact

➢ Visual identification of caulk with PCBs is not reliable

**Office of Research and Development**
National Exposure Research Laboratory

8

# PCB Sources – Caulk and Other Sealants







➢ PCBs in caulk/sealants move over time into:
- ▪ Adjoining wood, cement, brick
- ▪ Air and dust inside schools
- ▪ Soil near school buildings
- ▪ Other materials/furnishings

➢ Emissions of PCBs into the air can be quite substantial
- ▪ Emissions can create indoor air levels above recommended  concentrations
- ▪ As the temperature increases, emissions increase
- ▪ Ventilation is an important factor

➢ Although installed 40 – 60 years ago, high PCB levels remain and emissions will continue far into the future

➢ Other PCB sources, like coatings and paints, will act much like caulk in releasing PCBs into the environment

**Office of Research and Development**
National Exposure Research Laboratory

9

5.86   As stated by the EPA (*supra*, p. 9), PCB-caulking and other sealants in school buildings can create indoor air levels above recommended concentrations. In addition, "high PCB levels remain and emissions will continue far into the future." *Id.*

5.87   Monsanto's PCBs were also produced and promoted as components of electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

5.88   "Commercial PCB mixtures vary from colorless to dark brown oils, and from viscous liquids to sticky resinous semisolids. Although PCBs evaporate slowly at room temperature, the volatility of PCBs increases dramatically with even a small rise in temperature. Equipment that contains PCBs can overheat and vaporize significant quantities of these compounds, creating an inhalation hazard that can be magnified by poor ventilation" (ATSDR, 2014, p. 25).

5.89   As stated by the State of Washington, "PCBs easily migrate or volatilize out of their original source material or enclosure and contaminate environmental media such as air, soil, stormwater, and sediment. For example, **PCB compounds volatilize out of building materials (such as caulk) and into the surrounding environment. PCBs can also escape from totally enclosed materials (such as light ballasts) and similarly contaminate and damage the environment.**" State of Washington's Complaint for Damages against Monsanto, p. 9, ¶ 37, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016) (emphasis added).

5.90   As stated by the State of Washington, "PCBs present serious risks to the health of humans… Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials." State of Washington's Complaint for Damages against Monsanto, p. 9, ¶ 38-39, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

5.91   **PCB light ballasts release PCBs.** The preceding information comes from the same EPA publication regarding PCBs in school buildings (EPA, 2014, pp. 10-11).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446



# PCB Sources – Fluorescent Light Ballasts





➢ Fluorescent and high intensity light ballast capacitors

- Prior to 1977 - Many (most?) contained PCBs
- 1977 – 1978  - Some new ballasts contained PCBs
-  After 1978     - No new ballasts manufactured w PCBs

➢ Some PCB-containing ballasts remain in place

- In several northeastern schools, 24% - 95% of the light ballasts likely contained PCBs

➢ Most PCB-containing ballasts have exceeded their expected lifetimes

➢ Failure and release of PCBs will continue and may increase



# PCB Sources – Fluorescent Light Ballasts



➢ PCBs are continuously released into the air from intact, functioning light ballasts

- When lights are off, emissions are low
- When lights are on, the ballast heats up, and emissions increase several-fold



➢ PCB ballasts can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces

- Air levels of PCBs can become quite large
- Surfaces can be contaminated
- Significant impact/costs to remediate



➢ Residues from previously failed ballasts can remain in light fixtures even if the ballast is replaced

- The impact on PCBs in the school environment has not been determined

FIRST AMENDED COMPLAINT FOR DAMAGES - 38

As stated (p. 10), PCB-containing light ballasts were manufactured until the late 1970s. ("Light ballasts" are components of light fixtures in buildings.) The "failure and release of PCBs will continue and may increase" in school buildings containing PCB-light ballasts. *Id.* This is because "PCBs are continuously released into the air from intact, functioning light ballasts. When lights are off, emissions are low. When lights are on, the ballast heats up, and emissions increase several-fold." *Id.* at 11.

5.92   **Failed PCB ballasts cause high levels of PCB contamination.** In addition, "PCB ballasts can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces." *Id.* When that occurs, "Air levels of PCBs can become quite large. Surfaces can be contaminated." *Id.*

5.93   **Toxic PCDDs and PCDFs.** Also of concern are the extremely toxic chemical byproducts of failing PCB-light ballasts, including dioxins and furans. Failing PCB-ballasts that pyrolyze their PCB contents generate and emit additional toxic chemicals called polychlorinated dibenzodioxins (PCDDs) and polychlorinated dibenzofurans (PCDFs). 50 Fed. Reg. 29,171 (July 17, 1985); *Ahrens v. Pacific Gas & Electric Co.*, 197 Cal.App.3d 1134, 1139, fn 2, 243 Cal.Rptr. 420 (1988).

5.94   Over time, school building materials become secondary sources of PCB contamination after absorbing PCBs emitting from the primary contamination sources, as illustrated in this diagram and in the following EPA slides (2014, pp. 12, 2):



FIRST AMENDED COMPLAINT FOR DAMAGES - 39

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446



# PCB Sources – Secondary Sources/Sinks







➢ PCBs released from primary sources are absorbed into other materials in the school environment over time

➢ Following removal of primary sources, PCBs in secondary sources may be released into the school environment and result in continuing exposures

➢ In some cases, secondary sources may need to be considered for additional remedial actions following removal/remediation of primary sources

**Office of Research and Development**
National Exposure Research Laboratory

12



# PCBs - A Complex Problem in Buildings

## Example Scenario

Primary Sources
- ● Caulk
- ■ Light Ballast

Secondary Sources/Sinks
- Surrounding Materials
- Paint
- Dust

HVAC Unit

- ■ Over 100 PCB chemicals
- ■ Multiple primary sources possible
- ■ Transport from sources to air, surfaces, dust, soil
- ■ Secondary sources created
- ■ Exposures through multiple pathways
- ■ Ventilation and temperature effects

| Ventilation   Primary PCB Source   Secondary PCB Sources and Sinks   Dust/Soil

**Office of Research and Development**
National Exposure Research Laboratory

FIRST AMENDED COMPLAINT FOR DAMAGES - 41

5.95    For these and other reasons, schools should not contain Monsanto's PCBs.

5.96    When a reasonably careful manufacturer learns that its product is toxic and poses public health hazards, the manufacturer stops manufacturing it, recalls its product, and warns the public about the product.

5.97    But Monsanto never recalled PCBs, despite knowing their toxicity and danger to public health. Instead, Monsanto continued to promote PCBs, particularly in electrical applications, until PCBs were banned.

5.98    Monsanto did not warn users of PCBs, such as the School District, the Health District, or the Plaintiffs, that Monsanto's PCBs are extremely toxic and pose a public health hazard.

5.99    Monsanto provided the public with no warnings, notices, bulletins, or information that PCBs are extremely toxic and pose a public health hazard. Any information provided by Monsanto during or after manufacture has been inadequate.

5.100   Monsanto's PCBs have contaminated schools in Washington, including the school in this case, causing harm to occupants of the school, including the Plaintiffs. As shown above, this was not only reasonably foreseeable, it was actually known to Monsanto that such harm would come to third parties such as the Plaintiffs. Accordingly, the Plaintiffs seek damages against Monsanto.

5.101   It was also reasonably foreseeable, based on Monsanto's history of experience with PCB customers and users, that some inspectors, owners, operators, providers, or maintainers of buildings would engage in negligent conduct that causes harm to third parties by exposing them to Monsanto's PCBs.

5.102   Unfortunately, Monsanto's PCBs continue to contaminate schools built before 1980, including the school in this case. As shown above, this is because Monsanto intentionally produced and promoted PCBs in a variety of construction applications. As a result of Monsanto's conduct, it was reasonably foreseeable that Monsanto's PCBs would be incorporated in buildings, including the school in this case, and would contaminate classrooms used by people, including the Plaintiffs, causing them damages. Monsanto's

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

PCB contamination of Sky Valley Education Center was a legal cause of injury to the Plaintiffs.

5.103  As shown in the following EPA slide (2014, p. 16), "Occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities." For the Plaintiffs and others in such school buildings, "Exposures will occur through inhalation, ingestion, and dermal contact."



The full EPA slide appears on the following page:

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446



# Exposures to PCBs in the School Environment









➢ Occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities

➢ In school buildings with exterior PCB sources, exposures may occur through contact with contaminated soil

➢ Exposures will occur through inhalation, ingestion, and dermal contact



*Figure from 2009 NIEHS  L. Birnbaum presentation*

5.104  As shown in the history below, the Sky Valley Education Center was contaminated with Monsanto's PCBs. This fact was publicly revealed in 2016 following environmental testing done in response to severely sickened and diseased teachers and over one hundred Sky Valley individuals reporting to the Snohomish Health District illnesses related to the school. The Defendants' wrongdoing led to the PCB contamination and caused chronic toxic exposure to the Plaintiffs, causing them damages.

5.105  "Monsanto's PCB contamination constitutes injury to the State's public natural resources and to other property and waters of the State [of Washington], for which the State seeks damages, including on behalf of itself and on behalf of its residents in its *parens patriae* capacity." State of Washington's Complaint for Damages against Monsanto, p. 5, ¶ 16, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

**E.    The school buildings became toxic, injuring children and adults.**

5.106  **History of the school buildings.** Starting in the 1950s, the school campus located in Monroe at 351 Short Columbia Street, near Hill, Kelsey, and Sams Streets, was known as Monroe Union High School or Monroe High School.

5.107  Today, the tax accessor records identify the property as belonging to Union High School District 402:

UNION HIGH SCHOOL DIST 402
HILL & KELSEY ST
MONROE, WA   98373

SEC 01 TWP 27 RGE 0651/2 SE1/4 SW1/4
NE1/4 LESS N 30FT FOR ST PER AP
9001110281
V 2299 P 941

5.108  The following page is a true and correct copy of a page of this government record, which is also attached as **Exhibit S**:

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

2706010010230 0

**UNION HIGH SCHOOL DIST 402**

**HILL & KELSEY ST,MONROE,WA,98272,USA**

Printed 08/09/2016

Card No. 1 of 1

681

Tax ID 0127061 0230003

UNION HIGH SCHOOL DIST 402
HILL & KELSEY ST
MONROE, WA  98272
SEC 01 TWP 27 RGE 06E1/2 SE1/4 SW1/4
NE1/4 LESS W 30FT FOR ST PER AF
9001110281
V 2299 P 941

Neighborhood Number
6106001

Neighborhood Name
City of Monroe secondary

TAXING DISTRICT INFORMATION
Jurisdiction Name    Snohomish
Area                 001
Corporation          103
Section & Plat       0
Routing Number       2706011

**Transfer of Ownership**

**Site Description**
Topography
Public Utilities
  Water, Sewer, Electric
Street or Road
  Paved
Neighborhood
Zoning
Legal Acres:
  4.2900

**Valuation Record**

| Assessment Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| | Reval | Reval | Reval | Reval | Reval | Reval | Reval |
| Reason for Change | | | | | | | |
| 0 | L | 1401500 | 1214700 | 1121200 | 1121200 | 1121200 | 1121200 | 1214700 |
| | I | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |
| | T | 7995400 | 7808600 | 7715100 | 7715100 | 7715100 | 7715100 | 7808600 |
| 0 | L | 6593900 | 6593900 | 0 | 0 | 0 | 0 | 0 |
| | I | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |
| | T | | | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |

**Land Size**

| Land Type | Rating, Soil ID - or - Actual Frontage | Acreage - or - Effective Frontage | Square Feet - or - Effective Depth | Influence Factor |
|---|---|---|---|---|
| 74   Commercial V | | | 186872.00 | |

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

5.109  Other pages in the tax accessor's file for this property reference Union High School District 402 as well as "School District 103," including this excerpt dated April 13, 1990:

```
012706-1-023-0003    04/13/90    L900659


UNION HIGH SCHOOL DIST 402


L/C 0530        SCHOOL DISTRICT 103

SEC 01 TWP 27 RGE 06
S1/2 SE1/4 SW1/4 NE1/4 LESS W
30FT FOR ST PER AF 9001110281 V 2299
P 941
```

A "SITE SKETCH" of the campus shows school buildings built in 1950, 1963, 1965, and 1968. The site sketch is shown on the following page. The configuration of the school buildings at the campus appears the same today:

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.110 This school is located in Monroe, Washington, within the inspection jurisdiction of the Snohomish Health District.

5.111 According to its own statements, "[t]he Snohomish Health District inspects all schools (public and private) in order to verify compliance with minimal environmental standards for education facilities, as per WAC 246-366-040." Health District "inspectors may check lighting, ventilation, and safety equipment." The enforcement requirements are stated in Health District letters and Washington law. RCW 43.20.050(5).

5.112 The facts of the following inspections—and the lack of annual inspections in recent decades—is based on Snohomish Health District's responses to Public Records Act requests.

5.113 From the late 1950s through 1990, the Snohomish Health District conducted inspections of these school buildings on a roughly annual basis. During this time, inspectors regularly cited Monroe School District for violating requirements for minimum lighting intensities for these school buildings. Despite these citations, apparently no penalties or enforcement actions were taken.

5.114 For example, a Snohomish Health District school inspection report, dated 1973, recorded code violations for ventilation, lighting, and safety for these school buildings. The inspector wrote, "Lighting is substandard in a number of places in this building as has been reported every year since the school was built." Oct. 15, 1973 School Inspection report by Snohomish Health District, to Monroe #103, Monroe High School (Bates stamped 000054) (emphasis in original).

5.115 Lighting continued to be substandard in subsequent decades. This is significant because, years later, the same substandard lighting fixtures in these school buildings exposed the Plaintiffs to PCBs and other toxic chemicals.

5.116 Around 1977, the usage of the school buildings changed from the High School program to the Monroe Junior High.

5.117 Although Monroe Public Schools corrected some safety standard violations over the years, other safety standard violations in the school buildings persisted. For

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

example, a letter dated 1980 from the Health District to Monroe School District reported complaints related to ventilation, sanitation and environmental conditions, and noted that, "with little exception, these problems have been noted on our inspection reports for the past several years. Because of the possible health and safety impact upon your students and staff, we feel it is important that substantial changes be made." June 13, 1980 Snohomish Health District letter to Monroe School District (Bates stamped 000080-81).

5.118  The 1981 Health District inspection report for these school buildings cited deficiencies in areas related to ventilation and lighting, stating "lighting is poor in classrooms and restrooms in the pods [classrooms]." 1981 Health District inspection report to Monroe School District (Bates stamped 000105-08).

5.119  The 1982, 1984, and 1985 inspection reports noted similar deficiencies. For example, the 1984 report stated, "As we have pointed out for several years now, pod classroom lighting is poor." 1984 Health District inspection report to Monroe School District (Bates stamped 000118-24).

5.120  Around 1987, the usage of the school buildings changed from being the Monroe Junior High to the Monroe Middle School.

5.121  In the 1990s, the Health District only conducted safety inspections in 1990 and 1996. (In 1999, there was a complaint investigation report—not an inspection report—regarding poor kitchen ventilation.) There were no Health District inspections of the school buildings in 1991, 1992, 1993, 1994, or 1995. In the 1996 inspection report, the Health District again cited Monroe School District for ventilation and lighting code violations in these school buildings.

5.122  The Health District did not conduct a regular inspection of these school buildings in 1997, 1998, 1999, 2000, 2001, 2002, 2003, or 2004.

5.123  By the year 2000, the School District knew that its school buildings built before 1980 may contain PCB-light ballasts. A "LIGHTING AND BALLAST DISPOSAL PROCEDURES" policy was established. It required inspection of all light ballasts during the summer of 2000. *See* ¶ 3. PCB-light ballasts must then be marked for

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

identification. *Id.* Then "**All ballasts that are assumed to contain PCBs must be disposed of as hazardous waste.**" *Id.* at ¶ 4 (emphasis added).

5.124 The School District and the Health District should have ensured the removal and remediation of PCBs and other toxic chemicals from the school. The public entity Defendants were negligent in not doing so, which was a proximate cause of Plaintiffs' damages.

5.125 The Health District should have enforced the minimum environmental safety standards relating to lighting intensities. If the Health District had done so since 1980, the new light fixtures would have been PCB-free. The Health District's lack of action, particularly in light of its actual knowledge of decades of safety code violations, was negligent and a proximate cause of Plaintiffs' damages.

5.126 The 2003 "Health and Safety Guide" by the State Department of Health and Superintendent of Public Instruction specifically recognized the existence of PCBs in school buildings:

## I. LIGHTING

| | | Recommended | Required | WAC or Other Code Reference | Plans Review |
|---|---|---|---|---|---|
| I 010<br>S ☐ U ☐ | Inspect all fluorescent light ballasts for PCB content, being certain to wear rubber gloves and goggles. Identify PCB ballasts for future replacement. Almost all fluorescent light fixtures made before July 1979 contain small amounts of highly concentrated PCB's in their ballasts. that can leak PCB contaminated oil. See website: www.epa.gov/pcb | x | | EPA | |
| I 011<br>S ☐ U ☐ | Clean all PCB leakage, including any oil-like film, and replace all leaking ballasts. Dispose of leaking ballasts and cleaning materials in accord with EPA and DOE regulations. Wearing gloves and goggles is important for personal protection as PCB's are absorbed through the skin. Call 1-800-424-4372 or see website: www.epa.gov/r10earth/pcb.htm | | x | 40 CFR Part 761 | |
| I 012<br>S ☐ U ☐ | Under the Federal Toxic Substances Control Act, a leaking ballast containing PCB's must be packaged in a container approved for PCB disposal, marked "contains PCB's" and have an accompanying manifest. It must be shipped by an authorized PCB transporter to a licensed PCB disposal facility. See web: www.epa.gov/r10earth/pcb.htm | | x | TSCA<br>40 CFR Part 761 | |

Office of Superintendent of Public Instruction and Department of Health. OSPI-DOH School Health and Safety Guide, January 2003, p. 26.

5.127 The negligence of the public entity Defendants allowed PCBs to remain in the school buildings, which was a proximate cause of PCBs remaining in the old Monroe Middle School, later known as Sky Valley Education Center, which contaminated the school and chronically poisoned children and adults, including the Plaintiffs.

FIRST AMENDED COMPLAINT FOR DAMAGES - 51

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1   5.128  It may be that the public entity Defendants were not fully aware of the

2   dangers of PCBs due to a lack of warnings from Monsanto. Monsanto's statements

3   regarding PCBs have historically minimized the risk of PCBs to human health. Such

4   statements may have deceived, misled, or lulled the public entity Defendants into inaction

5   regarding the removal of PCBs from school buildings.

6   5.129  The 2003 State policy also required minimum light intensities in school

7   buildings. Here is excerpt from that policy requiring minimum lighting:

## I. LIGHTING

| | | Required Recommended | WAC or Other Code Reference | Plans Review |
|---|---|---|---|---|
| I 001 S U | Minimum light intensity of 10 foot candles, from general, task, or natural lighting shall be provided in non-instructional areas including auditoriums, lunchrooms, assembly areas, toilet and store rooms, corridors, and stairs. | x | 246-366-120(1) | x |
| I 002 S U | Minimum light intensity of 20 foot candles, from general, task, or natural lighting shall be provided in gymnasiums including main and auxiliary spaces, and shower and locker rooms. | x | 246-366-120(1) | x |
| I 003 S U | Minimum light intensity of 30 foot candles, from general, task, or natural lighting shall be provided in kitchen areas including food storage and preparation rooms. | x | 246-366-120(1) | x |
| I 004 S U | Minimum light intensity of 30 foot candles, from general, task, or natural lighting shall be provided in instructional areas including study halls, lecture rooms, and libraries. In rooms with computers, or during audio-visual presentations, lighting may be reduced. | x | 246-366-120(1) | x |
| I 005 S U | Minimum light intensity of 50 foot candles, from general, task or natural lighting shall be provided in special instructional areas including sewing rooms, laboratories (including chemical storage areas), CTE (voc-ed) trade, industrial shops, drafting rooms, and visual & performing arts rooms. | x | 246-366-120(1) | x |

5.130  If the minimum lighting requirements had been enforced by the School

District or the Health District at any time since 1980, they would have uninstalled the

PCB-light ballasts at the school and installed code compliant, non-PCB light ballasts.

This would have prevented or minimized much of the PCB contamination and subsequent

toxic poisoning of the Plaintiffs. Because the public entity Defendants did not do this,

however, the Plaintiffs were chronically exposed to toxic contamination. The public

entity Defendants' negligence was a proximate cause of Plaintiffs' damages.

5.131  In the 2000s, the Health District only conducted safety inspections of these

FIRST AMENDED COMPLAINT FOR DAMAGES - 52

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

school buildings in 2005, 2007, and 2009.

5.132  In the 2005 inspection letter and report, the Health District stated, as usual, that its "inspectors may check lighting, ventilation, and safety equipment" to "verify compliance with minimal environmental standards for educational facilities, as per WAC 246-366-040." The Health District cited Monroe School District for ventilation and lighting standard violations, but again failed to enforce compliance. 2005 Health District letter and inspection report to Monroe School District (Bates stamped 000146-51).

5.133  For CO2 concentration limits, ASHRAE Standard 62-2001 recommends no more than 700 ppm above the outdoor concentration as the upper limit for occupied classrooms, which is usually around 1,000 ppm. Carbon dioxide is an asphyxiate that, when measured, serves as a proxy for the quality of ventilation in occupied classrooms.

5.134  The 2005 inspection report was the first Health District report to measure and record carbon dioxide air quality violations at the school buildings. The report recorded 25 readings in 25 separate classrooms at these school buildings that exceeded 1,000 ppm of carbon dioxide. Six readings were above 1,500 ppm. Four readings were above 2,000 ppm. Two readings were above 3,000 ppm. *Id.* at 149.

5.135  As in past years, however, the Health District did not enforce compliance with the minimal environmental standards for the school.

5.136  In 2005, the State compared sensitive or vulnerable individuals like children to "canaries in the coal mine." The introduction is reprinted on the next page:

///
///
///
///
///
///
///
///

FIRST AMENDED COMPLAINT FOR DAMAGES - 53

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

**Background**

Students and school staff deserve and expect a healthy and comfortable environment in which to learn and teach. Similarly, parents expect schools to provide a healthy environment conducive to student learning and one that does not promote or exacerbate illnesses in their children. Within the school environment, reduced indoor air quality (IAQ) due to a lack of fresh air, chemical and biological contaminants, temperature, and humidity has resulted in student and staff health concerns. These concerns may be expressed as complaints of: headaches, rashes, tiredness, respiratory or eye irritation; and may result from single or multiple factors. Since individuals respond to stressors differently, it's likely that individuals that respond initially may be more sensitive than others and are in essence like the "canary in the coal mine," providing an early indication of poor or reduced IAQ. Therefore, it is important that all concerns be taken seriously and investigated thoroughly. An open and proactive response to an expressed IAQ concern can prevent a minor situation from becoming a major problem.

Considerable evidence exists supporting a relationship between poor IAQ and student learning and illness. Children spend between 80 and 85 percent of their time indoors, which includes about seven hours per day in school. Poor indoor air quality in schools is associated with increased student absenteeism and reduced student academic performance. As an example, a recent study involving Washington and Idaho schools found that classroom carbon dioxide ($CO_2$) concentrations greater than 1000 ppm, due to inadequate fresh make-up air, were associated with a 10 to 20 percent increase in student absenteeism. During the 1990s, the incidence of asthma in young children rose by nearly 60 percent and was responsible for ten million missed school days per year nationwide. In the mid 1990s, one in five schools across the United States, representing 8.4 million students, was identified as having IAQ problems. Furthermore, maintenance and operations budgets have declined as a percentage of school operating budgets from nearly 12 percent in 1990 to nine percent in 2000, which may contribute to poor indoor air quality in both new and aging school buildings.

Washington State has 296 school districts with more than 2,200 buildings and over one million students. While the total number of IAQ concerns reported in Washington State schools is unknown, several school districts have experienced severe IAQ events that have resulted in temporary school closures. Discussions with officials from these districts highlight the need for a clear and systematic approach that enables school administrators to quickly and effectively investigate and resolve IAQ concerns.

Wash. State Department of Health, Office of Environmental Health & Safety. Responding to Indoor Air Quality Concerns in our Schools. June 2005, p. 5, available at https://www.doh.wa.gov/CommunityandEnvironment/Schools/EnvironmentalHealth (last visited November 15, 2017).

5.137   In 2006, the Health District did not conduct an inspection of the school.

5.138   In 2007, the Health District inspected the school and noted "there were several items noted during this safety inspection that appear **not to have been addressed**

FIRST AMENDED COMPLAINT FOR DAMAGES - 54

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

since the last inspection conducted in 2005." 2007 Health District letter and inspection report to Monroe Public Schools (Bates stamped 000153-59) (emphasis added). This included ventilation violations as well as more than a dozen $CO_2$ measurements in different classrooms that exceeded 1,000 ppm, with five measurements that exceeded 1,500 ppm. *Id.* at 154, 156-57. The Health District also cited the School District for violating minimum light intensity standards in the Music rooms, the Library, and a half-dozen classrooms. *Id.* at 153, 155.

5.139   In 2007, the Health District did not enforce compliance with the minimal environmental standards for the school buildings.

5.140   In 2007, the School District received its State Study and Survey by an architecture firm, Hutteball & Oremus, regarding the District's public educational facilities. The study reported to the School District that the school buildings, then known as the Monroe Middle School, have safety issues. The Monroe Middle School "is deteriorating at a rate which exceeds that of normal maintenance efforts and funding." 2007 Hutteball & Oremus State Study and Survey for Monroe School District, p. 219. "The level of deterioration at this facility is the most severe of any school within the District." *Id.* at Executive Summary. The study recommended demolishing the existing classrooms and library. *Id.* at 19. "None of the existing HVAC equipment is in compliance with current codes." *Id.* at 69. The study reported that the lighting was deficient, and recommended that the lighting system be upgraded and replaced throughout the facility. *Id.* at 70, 18. Hazardous material existed in the school buildings: "The campus is reported to contain friable asbestos containing material such as pipe insulation and non-friable vinyl asbestos floor tile. The Classroom/Library building contains insulated asbestos panels at the window areas." *Id.* at 11. The study did not mention PCBs, but recommended a hazardous material survey by an independent consultant in conjunction with planning of future modernization, additions, or replacements. *Id.* The study stated that "the Monroe Middle School is in need of immediate renovation and upgrades… **Existing life safety issues, energy inefficiencies,**

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

**and code issues will continue to exist until significant action is taken to correct these deficiencies**." *Id.* at Summary, 25 (emphasis added).

5.141  The School District did not follow these recommendations in 2007, but instead continued to use the school buildings in their condition for several more years.

5.142  In 2008, the Health District did not conduct an inspection of these school buildings.

5.143  In 2009, the Health District inspected the school buildings and noted "there were several items noted during this safety inspection that appear **not to have been addressed** since the last inspection conducted in 2007." 2009 Health District letter and inspection report to Monroe School District (Bates stamped 000254-62) (emphasis added). The repeated violations included safety standards relating to ventilation, lighting, and air quality, including roughly a dozen rooms where $CO_2$ levels exceeded 1,000 ppm. *Id.* at 254-61.

5.144  Again, the Health District did not enforce compliance with the minimal environmental safety requirements for these school buildings.

5.145  In 2010, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

5.146  In May of 2011, the Health District inspected the school buildings and noted "there were several items noted during this safety inspection that appear **not to have been addressed** since the last inspection conducted in 2009." 2011 Health District letter and inspection report to Monroe School District (Bates stamped 000270) (emphasis added). Repeated violations included safety standards relating to ventilation and lighting. *Id.* at 266-70. This report did not measure and record $CO_2$ levels.

5.147  But the Health District did not enforce compliance with the minimal environmental safety requirements for these school buildings.

5.148  If the Health District or the State had enforced compliance with minimum lighting safety requirements in 2011, then the School District would have uninstalled the toxic PCB-light ballasts at the school buildings and installed code compliant, non-PCB

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

light ballasts. This would have reduced the PCB contamination and subsequent PCB poisoning of the Plaintiffs. But the Health District and the State did not enforce compliance. That was negligent and a proximate cause of Plaintiffs' damages.

5.149   Following the spring of 2011, the School District removed the middle school program from the school buildings.

5.150   The School District chose to move an education program called Sky Valley Education Center into the school buildings.

5.151   Sky Valley Education Center was and is an alternative kindergarten through twelfth grade education program. The School District's parent partnership program required parents to be in school with their children under the age of 12 as a condition of being enrolled in the Sky Valley program. As a result, many parents spent time with their children in the classrooms. Many mothers were also pregnant or had infants with them at school.

5.152   In the summer of 2011, the School District did not conduct a hazardous material survey of the old Monroe Middle School. The School District also failed to conduct any hazardous material abatement or renovation work of the school buildings.

5.153   The Monroe School District administered the Sky Valley Education program at this location, starting in September of 2011, while the Union High School District owned the premises.

5.154   In the 2010s, the Health District only conducted safety inspections of these school buildings in 2011, 2013, and 2016.

5.155   In December of 2011, the Health District inspected Sky Valley Education Center, now occupying the site of the old Monroe Middle School buildings. As in past years, the Health District cited the Monroe School District for violations of primary and secondary school safety requirements, WAC 246-366. Jan. 2011 Health District letter and report to the Monroe School District (Bates stamped 000273-79). The Health District cited the School District for violations of ventilation and lighting intensity requirements.

5.156   In 2011, the Health District did not enforce compliance with minimal

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

environmental safety requirements for these school buildings.

5.157  In 2012, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

5.158  In 2013, the Health District inspected Sky Valley Education Center. As in past years, the Health District cited the School District for violations of primary and secondary school safety requirements, WAC 246-366, including lighting intensity and ventilation requirements. 2013 Health District letter and report to the School District (Bates stamped 000283-87). The carbon dioxide levels in four classrooms was measured and exceeded 1,000 ppm. *Id.* at 283.

5.159  In 2013, the Health District did not enforce compliance with minimal environmental requirements for these school buildings.

5.160  In 2014, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

5.161  From 2011 through 2016, the school buildings continued to have PCB-caulking and PCB-light ballasts, some of which failed over time and leaked PCBs and pyrolyzed PCB byproducts such as dioxins and furans within the school.

5.162  It is unknown exactly how many PCB-light ballasts failed, fumed, leaked, or smoked PCBs or PCB byproducts (dioxins and furans) into Sky Valley classrooms between 2011 and 2016. According to a 2014 Monroe School District memorandum, however, by that time it appears that more than 100 light ballasts had failed, resulting in "Fixtures requiring maintenance cleaning." *See* MSDG_014266.

5.163  From 2011 through 2016, the School District does not appear to have conducted any environmental testing regarding the various levels of PCBs, dioxins, or furans in the school buildings during PCB-light ballast failure events or in their immediate aftermath.

5.164  Students and teachers witnessed different PCB-light ballast failures in different classrooms. The failing PCB-light ballasts burned, fumed, or smoked vapors into the classrooms. Some failing PCB-light ballasts also dripped PCB fluids onto the

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

desks and carpets. The Monroe School District's solution for one such PCB leak was to put a bucket under the leaking ballast, which collected a puddle of PCB fluid. This open collection of PCB fluids was done while children used the classroom. The bucket was left in place for several days. The PCB-stained carpet was left in place even longer.

5.165 One Sky Valley teacher recorded some PCB-light ballast failures and probable failures during this time period. For example, in April 2014 a "ballast in Nona's room caught fire and we could smell the smoke in rooms A, C and D and the hallways." Another ballast failed and created "a bad smell" the following week. Some teachers began researching the issue, inspecting overhead lights in the rooms, and reporting their concerns to the Monroe School District. Here is one photo (taken by a teacher during that time) of stained light fixture housing, along with the teacher's notes:

ballast plates with dried black/brown residue assumed to be previous ballast oil leaks. I remember that there at least two (first ballast on left as enter the room from the hallway and one near the back of the room on the window side) and maybe three lighting plates with brown residue that I assumed was oil from ballast (See Figure 1). We also looked at the fixture in room A that had leaked in 2010 and found that it also had brown residue.



Figure 1: Ballast leak in Room C (Note: photo taken April 2014, tray replaced May 2016)

FIRST AMENDED COMPLAINT FOR DAMAGES - 59

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

1       5.166   In response to other light ballast failures, the Monroe School District

2   maintenance department staff often put the stained light fixture housing materials (along

3   with cleaning rags) in hallways or leaning against classroom walls. Some such housing

4   materials were left in common areas for weeks.

5       5.167   In 2014, at least three Sky Valley teachers submitted indoor air quality

6   reports for classrooms, reporting symptoms of acute headaches, sinus issues, burning

7   eyes, "pressure" in the head," sneezing, and neck pain. Nov. 14, 2014 SVEC Preliminary

8   Indoor Air Quality Assessment, East Pod, by EHSI, p. 2.

9       5.168   The Monroe School District knew that the Sky Valley Education Center

10  classrooms and common areas contained PCB-light ballasts. The Monroe School District

11  also knew that the PCB-ballasts would fail and make "a very nasty smell filling a

12  classroom." The Sky Valley principal acknowledged this to the Sky Valley staff,

13  although the principal assured staff that the building is "safe." Here is part of the Sky

14  Valley principal's message to staff in April of 2014:

15  

16  Hi SVEC Staff,

17  I wanted to let you know about a challenge we are having with the lighting in our school and make sure you are aware how to get your lighting fixed should you have an issue. Please know that we are complying with Risk Management policies and procedures regarding these light fixtures; and as you all know, Risk Management takes its job of protecting staff and students very, very seriously!

18  I have met with the Maintenance and Facilities Director, Ralph Yingling, consulted with the Assistant Superintendent of Operations, John Mannix (who among other things is in charge of Facilities and Risk Management) and talked with our custodians Dean and Tim to review our procedures to ensure safety.

20  

21  Some of the lighting ballasts in our building (as with several other schools in the district and many schools nationwide) are quite old and contain material with PCBs. This material requires special care.  At this time, there are some of these old ballasts in many of our classrooms and common areas. As these ballasts go out, we are replacing them with new ballasts that do not contain PCBs.

23  

24  In the meantime, we want you to be sure to follow the procedure below to prevent any issues from happening in your classroom. The issues we have experienced are a very nasty smell filling a classroom and the large bulbs getting extremely hot then producing a gooey substance around the lighting in the fixture. Do not attempt to mess with or fix the light on your own. That job must be done by one of our custodians who knows what equipment to use, how to take care of the problem safely, and how to dispose of the materials properly.

26  ...

27  the number one priority of a school district. Our building is quirky and old and sometimes a challenge. But it is ours. And it is safe.

28  Karen

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

1      5.169  The Sky Valley principal told parents that they should not complain about

2  the condition of the school buildings or else they could lose their program. Instead, the

3  principal said that parents should be grateful to have the campus.

4  5.170  In response to complaints in 2014 by some teachers, however, the Monroe School

5  District maintenance department conducted some inspections and drew some maps of the

6  school building ceilings and light fixtures. Some maps are attached to this complaint as

7  **Exhibit T**. Different areas of the school buildings are depicted as showing PCB-light

8  ballast leaks. Here is a portion of one of the maps (a later draft version of

9  MSDG_014453), looking up at the ceiling of the south pod:



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.171  In October of 2014, the Monroe School District director of facilities and operations recorded carbon dioxide levels of 1,700 ppm in one classroom. *EHSI 2014 Report.* In November of 2014, roughly ten measurements of classroom areas showed CO2 above 1,000 ppm. *Id.* at 7. An independent contractor, EHS-International, Inc., concluded that "there is not a mold problem in the classrooms assessed," and stated that "the reported symptoms which include headaches, sinus issues and sneezing are more likely related to under-ventilation of the spaces as indicated by indoor carbon dioxide concentrations that exceed 1,000 parts per million (ppm) during classroom sessions." *Id.* at 1. Although "carbon dioxide is considered a surrogate for other airborne contaminants," neither the School District nor EHSI appear to have measured the concentrations of PCBs or other toxins in the classrooms at this time. *Id.* at 12.

5.172   In response to one student's complaints of headaches, the Health District conducted a field investigation and found that classroom "airflow was low (CO2 high)." Jan. 2015 Health District Field Investigation Report (Bates No. 000289).

5.173   Apart from that field investigation, the Health District conducted no regular, comprehensive inspection of the school buildings in 2015.

5.174   Despite the Health District's lack of inspections in the fall of 2015, the Health District had actual knowledge that Sky Valley teachers reported being sickened by the school.

5.175   In the fall of 2015, one Sky Valley teacher was taken away from the school buildings by ambulance due to neurological symptoms. She later resigned due to illnesses she attributed to the school buildings. The substitute teacher who took her place began having neurological symptoms in the weeks that followed, including a seizure, until he also resigned within three to four months of assuming the post. Many other teachers developed diseases like thyroid disorders, Hashimoto's Disease, and cancers. Roughly a dozen, if not more, teachers resigned from working in these school buildings. Later, roughly a dozen teachers also filed a union grievance against the Monroe School District for the toxic contamination in the school buildings. Children and parents in these

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

classrooms also developed concerning symptoms and diseases, as outlined below.

5.176   Because the cafeteria "gathering area" was too small to accommodate everyone for mealtimes, children and adults regularly ate lunches and snacks in their classrooms.

5.177   By the end of 2015, if not earlier, the Health District had actual knowledge that the school buildings contained PCB spills and PCB-containing materials.

5.178   Despite this knowledge, and upon request by the Monroe School District, in 2015 the Health District canceled the regular inspection of the school buildings. The Health District canceled the inspection scheduled for September of 2015, and instead rescheduled it to December of 2015. Upon request by the School District, however, the Health District also canceled the inspection scheduled for December of 2015. The Health District delayed the inspection until January of 2016.

5.179   As in 2014 and previous years, the Health District did not enforce compliance with the minimum environmental safety requirements for these buildings in 2015.

5.180   During 2015 and 2016, the Health District received and compiled complaints about illnesses associated with the buildings.

5.181   But Health District staff told complaining Sky Valley families and teachers that the Health District would not take any enforcement action against the School District unless eventually many people became sick.

5.182   Between March of 2013 and January of 2016, the Health District conducted no regular inspection and issued no regular inspection report to the Monroe School District regarding these school buildings.

5.183   In December of 2015 and January of 2016, the Monroe School District contracted with environmental engineers to conduct indoor air quality samples, which were then analyzed in a laboratory for PCB content. Some air samples were taken while classes were in session. Apparently unbeknownst to the environmental engineers, this air quality sampling of indoor classroom air was done with exterior windows and doors wide

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

open, rendering the results invalid. During the testing, teachers and students wore their winter coats in the classrooms. Other air samples were apparently taken over the holiday break when classroom air temperatures were low. One State (Department of Health) official emailed other officials, questioning the validity of these results:

I do not know the purpose of the PCB testing--is it to address this cluster of exposed students/concerned parents, or to address the ballast that smoked in August, or for another reason? I do agree with Nancy that the air test results are not representative of school exposures if the school temperature was low on the day of the testing. From the EPA info I've read, temperature should be taken into consideration when conducting air tests due to the volatility of PCBs. I also find it odd that the LOD for this set of samples of <200 ng/m3, is 5x higher that the LOD for the May 2014 report (<40 ng/m3). The author refers to the duration of sampling but that was the same (24 hours). For the above reasons, can't agree with the report conclusions about PCBs in air are less than the EPA guidelines.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000379.

5.184   By December of 2015, the Health District and the State Department of Health received reports that "multiple teachers have adverse health issues including dizziness, nausea and headaches," and that the school buildings contained both live and failed PCB light ballasts, according to a timeline created by Health District investigator Amanda Zych:

11/30/15 – Amanda Zych received call from Nancy Bernard, DOH School Program – They received a complaint from a teacher with health issues at the school.

12/1/15 – Amanda Zych received call from original complainant – Complainant #1. Complainant #1 (teacher) reported that multiple teachers have adverse health issues including dizziness, nausea and headaches. Complainant stated that 4 light ballasts burst (catch on fire and then oil was noted leaking out of the fixture) in Spring – 2014. Complainant #1 reported that consultants were hired by the Monroe School District to address. It was reported that another bulb burst and leak this Fall – August 2015 - after the consultants completed their work. Complainant #1 also alleged that the PCB light fixture that burst in August 2015 had oil that leaked onto the carpet in Room D and the School District covered the oil stain with duct tape.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000468.

5.185 By this time, if not earlier, the Health District was aware of reports of sickened children ("endocrine or hormonal issues") in addition to the "multiple teachers with adverse health issues," according to inspector Zych's chronology:

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1/8/16 – Amanda Zych received call from Complainant #2 – 5 children in the school, parent. All 5 children are sick with endocrine or hormonal issues. All 5 are in the Montessori pod. Forwarded her to the Pediatric Environmental Health Specialty Unit (PEHSU).

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000467.

5.186    Meanwhile, the Health District received report of multiple teachers who were "out on medical leave":

1/20/16 – Amanda Zych received call from Complainant #3 - parent has children at the school. Worried because multiple teachers are out on medical leave. Wondering if the school is safe. Knows about PCB ballasts. Forwarded her to PEHSU.

*Id.*

5.187    Despite this knowledge, no public entity Defendant conducted a health impact assessment on the Sky Valley population. Instead, the public entity Defendants kept the school open and in use.

5.188    In January of 2016, the Health District conducted an inspection and issued a report to the Monroe School District. As in previous years, the Health District cited the School District for numerous violations of WAC 246-366, including roughly twenty violations of minimum lighting intensity safety requirements as well as violations of ventilation standards.

5.189    The Health District report to the School District did not mention PCBs, PCB spills, or the sicknesses of Sky Valley teachers, parents, and children.

5.190    Meanwhile, the public entity Defendants learned that, in addition to the PCB contamination, the school buildings were contaminated with metals (including lead) in the school drinking water, radon in the indoor air, disturbed asbestos fibers, and molds, including black mold.

5.191    By March, Health District inspector Zych noted a report that people had been ill from the school buildings for years, back when the campus was the Monroe Middle School. Separately, the *Everett Herald* newspaper published the fact that the

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

School District "received eight complaints about illnesses potentially linked to air quality from 2001 to 2015." *See* Snohomish Health District Response to Public Record Requests at Bates No. 000465. The March complainant to the Health District reported that "70 people are known to be ill from Sky Valley. More don't want to be added to the list for fear of repercussions… People are very scared to report symptoms and join group." *Id.* at Bates No. 000475. This number grew in the coming months.

5.192   A Monroe School District administrator, John Mannix, dismissed these parental and teacher concerns at a community meeting, stating that "If only 10% of the population ever reacted to the environment, that would be normal." *See* Snohomish Health District Response to Public Record Requests, Bates No. 000474. Mannix also reportedly stated that the reported illnesses could not be caused by the disturbed asbestos fibers in the school buildings, because lung diseases caused by asbestos fiber exposure do not appear until decades after exposure.

5.193   Meanwhile, Health District inspector Zych reported to her colleagues regarding a dozen known cases of Sky Valley children experiencing "precocious puberty," which is a pathological early-onset of puberty caused by hormonal or endocrine disruptions. *Id.* at Bates No. 000585.

5.194   By April, Health District inspector Zych updated her chronology to reflect additional information, including notes on an environmental report on the buildings:

4/21/16 – Update. Continue to receive calls from numerous complainants. Printing out emails and adding additional service records to the file. Received a copy of the PBS Environmental report on 4/18/16. The report states that PCB levels were above the Rfd in 7 areas of the school. The report states that PCB-containing paint was noted on some interior walls in the school. The report states that some caulk used exterior and interior was noted to contain levels of PCBS.

*Id.* at 000592.

5.195   Health District inspector Zych created a spreadsheet of some symptoms and diseases of 63 Sky Valley complainants who had come forward to report adverse medical affects. The Health District spreadsheet is attached as **Exhibit U** (Bates No. 000593-96).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.196   Despite this knowledge, the public entity Defendants kept the school open and in use.

5.197   The Monroe School District's environmental contractors created a map entitled "PCB Light Fixture Cleaning," in which red dots showed the light fixtures throughout the school buildings. It is attached as **Exhibit V** along with a map showing School District remediation activities in the spring of 2016.

5.198   The school building maps show the room names and the rooms' PCB light fixtures—the **red dots**—that needed cleaning. Here was the Music Room and its red dots:

 

5.199   Here was the Gathering Area, where children and adults ate and socialized:

 

5.200   Here was Building 2, Annex, which housed classrooms A, B, C, D, and F, marked with the red dots in the classrooms, along with Building 1, the Office:

FIRST AMENDED COMPLAINT FOR DAMAGES - 67

1
2
3
4
5
6
7
8
9
10
11




12      5.201 Here were the numerous PCB light fixtures that needed cleaning in
13  Building 5, where the Plaintiff teachers taught and prepared lessons. Here is the map of
14  that building, the Library and the pod classrooms 1-20. Note the frequency of red dots:

15
16
17
18
19
20
21
22
23
24
25
26
27
28

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.202   By the end of April of 2016, 81 individuals had come forward to report to Health District inspector Zych regarding their diseases and symptoms they associated with Sky Valley Education Center:

**From:** Amanda Zych
**Sent:** Friday, April 29, 2016 4:01 PM
**To:** Kevin Plemel; Jeff Ketchel
**Subject:** Updated SVEC Complainant Summary

FYI –

Since December 2015, I have recorded 81 individuals that have complained of health effects that they associate with Sky Valley Education Center.

Of these individuals:

- 17 – thyroid issues (including 3 Grave's disease, 5 precocious puberty, 5 Hasimoto's disease and 1 hypothyroid)
- 29 – report fatigue
- 24 – report asthma/cough
- 23 report headache
- 21 report GI issues and nausea
- 17 report cognitive issues – "foggy brain"
- 11 report sore throat
- 7 Burning of lungs
- 9 dizziness, fatigue

Thanks!

**Amanda Zych** | Environmental Health Specialist | Environmental Health
3020 Rucker Avenue, Ste 104 | Everett, WA 98201 | **425.339.8774** | azych@snohd.org

 **SNOHOMISH**
**HEALTH DISTRICT**
WWW.SNOHD.ORG
*Public Health: Always working for a safer & healthier Snohomish County*

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000633.

5.203   The Health District sent at least two letters in June to the School District regarding elevated PCB levels, the closure of some classrooms, and required summertime remediation of the buildings. *See* **Exhibits W1** and **W2**. The Health District letters cited WAC 246-366-140, stating "the existence of unsafe conditions which present a potential hazard to occupants of the school are in violation of these regulations." *Id.* By the end of June, the Health District was aware of "over 100 parents, teachers and children [who] have reported illness that they associate with the building." *Id.* at W2.

5.204   Apart from a closed classroom or two, Sky Valley Education Center remained open through June of 2016.

FIRST AMENDED COMPLAINT FOR DAMAGES - 69

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.205   Another name for PCB-light ballasts is "**T-12 lights**." Here is a map of affected classrooms at the Sky Valley school:



*See* Monroe School District's Response to Public Records Requests, Bates No. MSDG_014499.

5.206   Before the 2016 school year was over, the Monroe School District had disposed of at least 1,648 pounds of PCB-light ballasts:

> 678 LBS. PCB BALLAST, DRUM # 2769
> 628 LBS. PCB BALLAST, DRUM # 2770
> 342 LBS. PCB BALLAST, DRUM # 2771

*See* MSDG_014240-41 (hazardous waste disposal manifest).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.207 Around this same time, the Monroe School District appeared to have possessed a PowerPoint regarding the dangers of PCB-light ballasts. Here are two of the slides:

## Common Health Effects

Chloracne and fingernail discoloration.

Skin and mucous membrane inflammation.

Swollen eyelids, excessive eye discharge and burning eyes.

Burning and edema of the face and hands.

Acute contact dermatitis.

Chronic absorption cause fatty degeneration of the liver.

Probable human carcinogen

Cause cancer in animals

## Chronic Health Effects

Chronic = long term.

Evidence of skin cancer.

Evidence of liver cancer.

Respiratory Tract Irritation.

Gastrointestinal Problems.

Bioaccummulation: builds up along the food chain; builds up in organic tissue.

*See* MSDG_014128, 014135. As shown earlier in this Complaint, the list of these adverse health effects due to PCB exposure is not complete.

5.208  The Monroe School District's environmental consultants conducted a litany of air, wipe, and caulking sample tests for PCBs between January and June of 2016. Results varied at different locations and different times within the school buildings, with some results as "none detected," other results characterized as being "low" or "safe" by the public entity Defendants, and with other results recognized as being "high." Many

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

wipe samples appear to have been taken *after* deep cleaning. Despite the cleaning efforts, PCB test results in May of 2016 were among the more elevated levels of PCBs detected.

5.209   By the spring of 2016, some families had unenrolled from Sky Valley due to the adverse medical effects that they associated with the school buildings. Other families stayed enrolled until June of 2016, having been either unaware of the reports and tests of environmental contamination, or having been assured by the Monroe School District that the school buildings were safe.

5.210   After some remediation in the summer of 2016, the Monroe School District resumed Sky Valley classes in September.

5.211   Some families attempted to return to Sky Valley in the fall, but unenrolled after re-experiencing adverse medical symptoms that they previously experienced in the school buildings. With the knowledge that the school buildings had been contaminated with toxic chemicals, these families unenrolled. Their spots were then filled by other families on the waitlist for the school program (Sky Valley is a popular program), while the Monroe School District assured the public that the school buildings were safe.

5.212   The Health District and School District had knowledge that this was happening, as shown in this fall 2016 email by inspector Zych to school administrators:

| From: | Amanda Zych |
| Sent: | Friday, September 30, 2016 3:10 PM |
| To: | 'Piplic, Devlin'; Mannix, John |
| Cc: | Kevin Plemel; Jeff Ketchel |
| Subject: | Complaint - SVEC |

John and Devlin,

For your awareness, I talked to a parent today on the phone that has concerns about Sky Valley. She stated that her daughter had rashes and her son had nose bleeds last year and were both fine over the summer. She went on to say no that they have been back for 2 weeks, symptoms have reoccurred. She stated that her daughter was in Music and Art on Tuesday and then her hands swelled up and had a red rash or hives on them. She stated that her son was in Robotics #1 , #18 and Art and then had a bad nose bleed last night.

**Amanda Zych** | Environmental Health Specialist | Environmental Health
3020 Rucker Avenue, Ste 104 | Everett, WA 98201 | **425.339.8774** | azych@snohd.org



SNOHOMISH
HEALTH DISTRICT
WWW.SNOHD.ORG
*Public Health: Always working for a safer & healthier Snohomish County*

FIRST AMENDED COMPLAINT FOR DAMAGES - 72

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

*See* Snohomish Health District Response to Public Record Requests, Bates No. 001398; *see also* Bates No. 001820 (Sky Valley parent emailing Zych that "Hope to hear something will change for our kids and families. We do love this program. As so many that cry that they still feel sick when they come near the building so cannot come [*sic*].").

5.213   Decades of PCB off-gassing, leaks, spills, and fume events, however, caused these school buildings to become secondarily contaminated as large toxic "sinks." That is, porous materials like library books, papers, bricks, and carpets absorbed the PCBs over the years and now release PCBs back into the indoor air. People who have been sensitized to PCB contamination after suffering PCB/PCDD/PCDF poisoning still cannot enter or use these school buildings without suffering uncomfortable, painful, or debilitating reactions, despite the purported abatement or sealing of the primary sources of PCBs (the PCB-caulking and the PCB-light ballasts) by the summer of 2016.

5.214   Environmental tests during the 2016-2017 school year continued to detect levels of PCBs in the air and classrooms of these school buildings to varying degrees, although many results showed "none detected" at the reporting limits. (There is a limit to the sensitivity of the air sampling and laboratory testing.)

5.215   As before, at least some environmental tests were conducted with the classroom windows "wide open," as reported to Health District inspector Zych:

3/1/2017 – phone call from Shamus Neary teacher – 360 – 348 – 6764 – Room F

He stated that he was concerned that the levels in the quarterly testing were 42,000 in his room. He stated that he was upset that the district didn't let him know of this sooner. I stated that we just received the information on 2/23/17.

He stated that when he came back from winter break he noticed the air sampling machine in his room and didn't understand why – he thought the testing was completed. He also stated that the window in his room was wide open. He stated he believes that this occurred on January 7th.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 001517.

5.216   According to the Health District, "Seven of the rooms that were tested during the PCB air sampling indicated levels in excess of established exposure limits."

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1    *Id.* at 001524.

2    5.217   The Monroe School District went to the press to claim that such year-2017

3    PCB results were "false positives." Superintendent Smith made this claim to reporters.

4    She also claimed that any past symptoms reported by members of the Sky Valley

5    Education community were minor and like "colds." This was not true. She knew this

6    statement was not true because parents and teachers had previously reported to her

7    serious illnesses and diseases, including sexual developmental disorders in young

8    children after they began attending classes in the school buildings.

9    5.218   The services of the environmental consultant were terminated.

10   5.219   Subsequent PCB testing results appeared to be lower (or "none detected")

11   than the pre-remediation testing results.

12   5.220   Until last year, when the PCB and other toxic contamination became

13   public, the School District kept the Sky Valley staff, parents, and children in the dark

14   about the actual toxic contamination in the school buildings.

15   5.221   Two out of three STEM teachers at the program have reportedly had

16   cancer since 2011. Three young parents of STEM students have died of cancer. Two

17   children have reportedly died of cancer. Other children and adults who spent time in the

18   school buildings have also suffered cancers, endocrine disorders, autoimmune disorders,

19   neurological disorders, and miscarriages.

20   5.222   Since the Monroe School District moved the Sky Valley Education

21   program into the old Monroe Middle School in 2011, many but perhaps not all children

22   and adults who spent time in the school buildings developed symptoms. The symptoms

23   varied in their type and intensity. They included eye irritation, vision difficulties, frequent

24   colds and infections, throat irritation, nose bleeds, allergies, asthma, persistent coughs,

25   difficulty breathing, heart palpitations, headaches, tremors, numbness, tingling,

26   confusion, memory loss, concentration difficulties, depression, anxiety, learning

27   problems, dizziness, nausea, vomiting, abdominal pain, gastrointestinal issues, joint pain,

28   thyroid issues, puberty abnormalities, weight issues, weakness, fatigue, chills, night

FIRST AMENDED COMPLAINT FOR DAMAGES - 74

sweats, skin rashes or hives or blisters, skin cysts, peeling skin, and other complaints.

5.223   The frequency and severity of the symptoms appeared to be positively correlated with the vulnerability of the individual and the amount of time spent in the school buildings. The symptoms and diseases worsened over time for these individuals.

5.224   Symptom severity generally improved during holiday breaks, when the children and adults spent time away from the school buildings.

5.225   At different times during the past few years, some Sky Valley parents and teachers raised serious health concerns associated with the school buildings to the Monroe School District and the Health District. Until early or mid-2016, the public entity Defendants did not appear to take the concerns seriously.

5.226   For example, in 2014 the Monroe School District head of maintenance, Ralph Yingling, told two teachers that they should not be concerned about the PCB-light ballasts. He added that he was in Vietnam and exposed to Agent Orange, and PCB-light ballasts are nothing to worry about in comparison.

5.227   Administrators for the School District promised some teachers that all PCB-light ballasts would be removed and replaced with safe light fixtures during the summer of 2014. This clearly was not done.

5.228   Another School District administrator ridiculed parents of "sick children" as not being interested in going to school.

5.229   The Monroe School District, or its Sky Valley principal, actively discouraged Sky Valley teachers from sharing environmental safety concerns with Sky Valley families.

5.230   The Monroe School District, or its Sky Valley principal, also actively discouraged parents from filing indoor air quality complaints with the School District.

5.231   The Sky Valley principal also admonished one teacher for cancelling classes due to her concerns about safety in her classroom.

5.232   That same teacher developed Hashimoto's Disease (a thyroid disorder) after teaching in that classroom.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

5.233   Some people who spent time in these school buildings cope with skin issues. Unlike headaches, gastro-intestinal pain, or other internal maladies, skin disorders can be photographed. Here are photographs of children, parents, and teachers showing skin sloughing, blisters, rashes, pigmentation changes, a neurological disorder, and a cyst:





FIRST AMENDED COMPLAINT FOR DAMAGES - 76

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





FIRST AMENDED COMPLAINT FOR DAMAGES - 77

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27



28

These photos (above) show blisters and sloughing skin in Sky Valley adults and children.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Many flares have spread since the fall of 2014, some flares lasting weeks or months. At least four were so painful that they interfered with sleep or required medical attention. This photo shows the start of a flare. In just a week, it got quite a bit worse. First photo was 2/13/15.



Second photo shows the rash spreading onto back of neck on 2/21/15.



3rd photo was 4/11/2015.



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27



28  Here are skin pigmentation changes in a Sky Valley adult and a child (above and below):

FIRST AMENDED COMPLAINT FOR DAMAGES - 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Here is chloracne on the back of a Sky Valley parent:

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446



Sky Valley children and adults also cope with hives, rashes, and acne. Here are photos of full body hives (above) and acne and rashes (below) in Sky Valley children:



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIRST AMENDED COMPLAINT FOR DAMAGES - 84

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



This is the first cyst (of a cluster) removed from a Sky Valley girl's scalp this past year.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

The photographs above are of about a dozen different Sky Valley individuals who developed skin, neurological, and other disorders as part of the constellation of symptoms they attribute to time spent in the school buildings before the School District remediated the buildings. Other photographs of children and adults in the hospital, whether due to encephalitis, cardiac problems, breathing problems, and neurological disorders—all of which have happened to Sky Valley children and adults—are not included. Plaintiffs will request entry of a protective order regarding Plaintiffs' medical records, identifiable photographs, and related personal information.

5.234   The Health District's history of citing Monroe Public Schools for code and safety deficiencies at these school buildings establishes two basic facts: (1) the school has had a history since the 1950s of poor maintenance and safety compliance up to present-day; and (2) Snohomish Health District knew that these school buildings suffered from poor maintenance and non-compliance with safety requirements, particularly in areas of ventilation and lighting.

5.235   Despite this knowledge, the School District did not enforce compliance with the minimum safety requirements at these school buildings. That was negligent and a proximate cause of Plaintiffs' damages.

5.236   Despite this knowledge, the Snohomish Health District did not enforce "compliance with minimal environmental standards for education facilities, as per WAC 246-366-040," which was the purpose of the Health District's inspections, until late last year. That was negligent and a proximate cause of Plaintiffs' damages.

5.237   The State Departments of Ecology and Health both recognized that PCBs "can cause adverse health effects in humans and wildlife including cancer and harm to immune, nervous, and reproductive systems. PCBs disrupt thyroid hormone levels in animals and humans, hindering growth and development." State of Wash. Department of Ecology and Department of Health. PCB Chemical Action Plan (Feb. 2015), p. 12, available at https://fortress.wa.gov/ecy/publications/SummaryPages/1507010.html, (last accessed November 14, 2017).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

5.238   These departments of the State have also been aware that toxic PCBs persist in school buildings built before 1979, and are aware that this represents a danger to the occupants of the buildings: "We are especially concerned about exposure to children in school buildings with old lamp ballasts and other PCB-containing building materials." *Id.* at 12.

5.239   The departments of the State know that old ballasts "are at a high risk for failing (dripping, smoking, and catching fire)." *Id.* at 15 (parenthetical explanation in original). The State recognized that the old ballasts release PCBs into the air breathed by children and other people in school buildings:

> Ballast failures can expose children to concentrated PCB oils and elevated PCBs in air. Low concentrations of lower chlorinated PCB congeners are continually released from lamp ballasts. When ballasts fail, high concentrations of a broader spectrum of congeners are released, so it is important to find and remove the lamp ballasts before they fail.

*Id.*

5.240   A reasonably careful governmental entity establishes and enforces policies to remove toxic chemicals such as PCBs from school buildings to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

5.241   A reasonably careful school building owner removes toxic chemicals such as PCBs to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

5.242   A reasonably careful school inspector requires a building owner to comply with the minimum environmental safety requirements to prevent injury and to protect people from harm.

5.243   A reasonably careful school inspector requires a school building owner to remove toxic chemicals such as PCBs to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

5.244   The public entity Defendants' failures to protect the Plaintiffs from reasonably foreseeable harms were negligent.

5.245   The public entity Defendants' negligence in these and other ways was

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1    reasonably foreseeable to Monsanto and does not serve to cut off the chain of causation

2    of Plaintiffs' damages.

3    5.246   Specifically, the School District used Monsanto's PCBs in a reasonably

4    foreseeable manner, *i.e.* as components of caulking and light fixtures integral to the

5    structures of the school buildings. The use of PCBs by the public entity Defendants was

6    not so highly extraordinary as to be unforeseeable. In fact, the use of PCBs by these

7    Defendants was consistent with Monsanto's intended promotion of its PCBs, *i.e.*, as

8    components of caulking and light fixtures. In addition, the continued use of PCBs in

9    school buildings is also reasonably foreseeable, as thousands of school buildings across

10   the United States continue to use and contain PCBs.

11   5.247   Due to the negligence of the public entity Defendants, however, the

12   Plaintiffs were exposed to PCBs and other toxic contamination. Their negligence was a

13   proximate cause of Plaintiffs' damages.

14   5.248   Although the School District and the Plaintiffs "used" Monsanto's PCBs

15   as components of the structures and fixtures of the school buildings, the Plaintiffs

16   themselves did not "misuse" Monsanto's PCBs.

17   5.249   The public entity Defendants' failures to require and supervise the removal

18   of PCBs from the school buildings was caused in part by Monsanto's wrongful conduct.

19   This is because Monsanto intentionally misrepresented facts about its PCB products, or

20   intentionally concealed information about PCBs, and this wrongful conduct was a

21   proximate cause of Plaintiffs' damages.

22   5.250   Specifically, Monsanto provided no warnings, notices, or bulletins to the

23   Snohomish Health District, the School District, or the Plaintiffs, which would have

24   alerted them to the full extent of the dangers of toxic PCB exposure in school buildings.

25   The reason is this: Monsanto profited for decades by producing and promoting PCBs, and

26   Monsanto continues to have a strong financial interest in denying the environmental

27   dangers and health hazards associated with toxic contamination caused by Monsanto's

28   PCBs.

FIRST AMENDED COMPLAINT FOR DAMAGES - 88

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

5.251   Due to the Defendants' wrongful conduct, the Plaintiffs have suffered past damages and will suffer future damages. Damages includes reasonable fears of present and future adverse medical consequences. *Wilson v. Key Tronic Corp.*, 40 Wn. App. 802, 701 P.2d 518 (1985) (where defendant operated a toxic landfill that poisoned local well water, plaintiffs' fears of present and future health problems stemming from actual ingestion of the toxic chemicals are reasonable and therefore compensable).

## VI.   LEGAL CONTEXT AND CAUSES OF ACTION

### A.   State law protects individual rights.

6.1   Plaintiffs bring claims for damages against the named Defendants under state law only for strict products liability, negligence, and exemplary damages, as outlined below, and under other applicable state law remedies as discovery may reveal.

6.2   The Plaintiffs respectfully request that the guarantees of the Washington State Constitution weigh in the consideration of legal rulings in this case. "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." Wash. Const., Art. I, § 1. The Washington Supreme Court recognizes "that the judiciary has ample power to protect constitutional provisions that look to protection of personal 'guarantees,'" including "judicially enforceable affirmative duties of the State." *Seattle School Dist. No. 1 v. State of Washington*, 90 Wn.2d 476, 502, 585 P.2d 71 (1978). This includes the "paramount duty on the State to make ample provision for the education" of children. *Id.* Courts have "ample power" to protect such constitutional guarantees and personal rights:

> When it comes to considering individual rights such as are protected by the guaranties, that the right to trial by jury shall remain inviolate; that no person shall be deprived of life, liberty or property without due process of law; that no law shall grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens; and many other constitutional guaranties that look to protection of personal rights, the courts have ample power, and will go to any length within the limits of judicial procedure, to protect such constitutional guaranties.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

*Seattle School Dist. No. 1 v. State of Washington*, 90 Wn.2d 476, 501, 585 P.2d 71 (1978) (holding in part that the school district, parents, and school children who were faced with deteriorating buildings and other shortfalls, had standing to sue the State for its violations of its paramount duty to make ample provision for the education of children), quoting *Gottstein v. Lister*, 88 Wash. 462, 493, 153 P. 595 (1915).

**B.   Plaintiffs are fault-free.**

6.3   Defendants cannot show that the Plaintiffs, who taught in the school, are at-fault for the toxic contamination and chronic poisoning. The teachers are fault-free.

**C.   Negligence claims are covered claims.**

6.4   The claims against the public entities are for negligent provision, establishment, maintenance, inspection, and enforcement of safety standards in the school, which were legal causes of Plaintiffs' damages. Stated differently, the public entity Defendants negligently managed the safety of the school, which caused the Plaintiffs to suffer damages. No "pollution exclusion" would apply to deny coverage, even if such an exclusion exists in any policy of insurance in this case. *Xia v. ProBuilders Specialty Insur. Co.*, 188 Wn.2d 171, 393 P.3d 748 (2017).

**D.   Defendants' joint and several liabilities.**

6.5   These claims relate to negligence and product liability for "hazardous substances" that contaminated the school buildings and poisoned the Plaintiffs. As a result, all Defendants are jointly and severally liable for all of Plaintiffs' damages. RCW 4.22.070(3); *Coulter v. Asten Group, Inc.*, 135 Wn. App. 613, 146 P.3d 444 (2006), reconsideration denied, review denied, 161 Wn.2d 1011, 166 P.3d 1217.

**E.   Monsanto Defendants' product liabilities to the Plaintiffs.**

6.6   **PCBs are a product.** Monsanto's PCBs are a "product" under Washington law. RCW 7.72.010(3).

6.7   **Strict product liability, not reasonably safe in construction (WPI 110.01).** A manufacturer of a product is liable if its product was not reasonably safe in construction and this was a proximate cause of plaintiff's damages. 6 Wash. Prac., Wash.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Pattern Jury Instr. Civ. WPI 110.01 (6th ed.). A product is not reasonably safe in construction when it is "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *Id.*, citing RCW 7.72.030(3). Monsanto's PCBs are extremely toxic, and their toxicity was a proximate cause of Plaintiffs' damages. The existence of Monsanto's PCBs in the construction materials, caulking, and light ballasts of the school building was unsafe to an extent beyond that which was contemplated by the other Defendants, their employees, and the Plaintiffs who "used" the PCB-containing materials in the school buildings, which contaminated the buildings and caused PCB-poisoning in the Plaintiffs and others. Monsanto is strictly liable for Plaintiffs' damages.

6.8     **Strict product liability, not reasonably safe as designed (WPI 110.02).** A manufacturer of a product is liable if its product was not reasonably safe as designed at the time it left the manufacturer's control and this was a proximate cause of plaintiff's damages. A product may be not reasonably safe as designed under either a balancing test or a consumer expectations test. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.02 (6th ed.).

6.9     At the time Monsanto manufactured PCBs, there was a high likelihood that the PCBs would cause injuries similar to that claimed by the Plaintiffs, and the seriousness of the injuries is significant. This outweighed any "burden" on Monsanto to design a product that would have prevented the injuries (*i.e.*, alternative chemicals or mechanisms used in caulking, light ballasts, and other applications, that are not "extremely toxic"), and any adverse effect that a practical and feasible alternative design would have on the usefulness of the product. *Id.* Monsanto is also liable under the consumer expectations test, considering the following factors: the relative cost to the School District of replacing the caulking, light ballast fixtures, and other materials later discovered to be contaminated with Monsanto's PCBs; the seriousness of harm caused by exposure to PCBs is high; the cost to Monsanto of eliminating PCB production would have eliminated PCB profits, while the feasibility of eliminating or minimizing the risk was readily available to Monsanto; and other factors as may be revealed in discovery. *Id.*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

6.10   Monsanto's PCBs were not reasonably safe as designed and this was a proximate cause of Plaintiffs' injuries following exposure to Monsanto's PCBs. This was reasonably foreseeable by Monsanto. In addition, any claimed "misuse" of toxic PCB-containing products by other Defendants, third parties, or even the Plaintiffs, was also reasonably foreseeable. Regardless, a product can be "not reasonably safe" even though the risk that it would cause the plaintiff's harm or similar harms was not foreseeable by the manufacturer at the time the product left the manufacturer's control. *Id.* (bracketed material). As designed, PCBs were not reasonably safe, and Monsanto is strictly liable for Plaintiffs' damages.

6.11   **Liability for negligence, "Comment K" unavoidably unsafe products (WPI 110.02.01).** A chemical manufacturer has a duty to use reasonable care to design chemicals that are reasonably safe. "Reasonable care" means the care that a reasonably prudent chemical manufacturer would exercise in the same or similar circumstances. A failure to use reasonable care is negligence. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.02.01 (6th ed.).

6.12   The question of whether a manufacturer exercised reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time of the plaintiff's injury. In determining what a manufacturer reasonably should have known in regard to designing its product, a jury should consider the following: a chemical manufacturer has a duty to use reasonable care to test, analyze, and inspect the product it sells, and is presumed to know what tests would have revealed; and a chemical manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby. *Id.*

6.13   From the first decade of manufacture, Monsanto knew that its PCBs were toxic. The scientific research regarding the toxicity of PCBs increased over time. Despite the actual and imparted knowledge of PCB toxicity, Monsanto continued producing PCBs so Monsanto profited from their sales. Monsanto only stopped producing PCBs due

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

to federal action banning their production. PCBs were never reasonably safe. They are toxic, durable, persistent, bioaccumulate, and are known to migrate from their source material to contaminate the surrounding environment. By their very nature as synthetic chemicals, PCBs were and are unavoidably unsafe products. Monsanto was negligent and is liable for Plaintiffs' damages.

6.14   **Liability for failure to provide warnings when manufactured (WPI 110.03).** A manufacturer has a duty to supply products that are reasonably safe. A product may be not reasonably safe because adequate warnings or instructions were not provided with the product. This can be proven either through a balancing test or a consumer expectations test. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.03 (6th ed.).

6.15   The balancing test establishes that Monsanto is liable: at the time of manufacture, there was a likelihood that PCBs would cause injury or damage similar to that claimed by the Plaintiffs, and given the seriousness of the injuries or damages, the lack of warnings by Monsanto were inadequate; and Monsanto could have provided adequate warnings or instructions. Monsanto could have provided warnings—but chose not to provide any warnings—such as "**CAUTION: CONTAINS PCBS (Polychlorinated Biphenyls), A TOXIC ENVIRONMENTAL CONTAMINANT REQUIRING SPECIAL HANDLING AND DISPOSAL**." Monsanto presumably chose not to provide such PCB warnings because the warnings would have reduced PCB sales and profits.

6.16   The consumer expectations test also proves that Monsanto is liable: the construction materials and fixtures containing PCBs are not cheap, and their replacement by the School District would likely be a factor considered; the seriousness of potential disorders and diseases (including reproductive toxicity and cancers) caused by PCB exposure is extremely high, especially considering the vulnerability of children; the cost and feasibility of eliminating or minimizing the risk are substantial; and other factors as discovery may reveal. *Id.*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

6.17    Monsanto's PCBs were not reasonably safe because adequate warnings or instructions were not provided, and this was a proximate cause of Plaintiffs' injuries. As a result, Monsanto is liable for Plaintiffs' damages.

6.18    **Liability for failure to provide warnings after manufacture (WPI 110.03.01).** A manufacturer has a duty to supply products that are reasonably safe. A product may be not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.03.01 (6th ed.). PCBs are not reasonably safe because adequate warnings or instructions were not provided after they were manufactured: (1) Monsanto learned, or a reasonably prudent manufacturer should have learned, about the dangers connected with PCBs (while and) after they were manufactured; (2) without adequate warnings or instructions, PCBs are unsafe to an extent beyond that which would be contemplated by an ordinary user such as the School District or the Plaintiffs; and (3) Monsanto failed to provide warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. Because Monsanto did not provide adequate warnings or instructions after its PCBs were manufactured and this was a proximate cause of Plaintiffs' injuries, Monsanto is liable for Plaintiffs' damages.

6.19    **No "useful safe life" defense, statute does not apply.** A statute of repose enacted in 1981 provides a defense to some product manufacturers. It provides that "a product seller shall not be subject to liability to a claimant for harm under this chapter if the product seller proves by a preponderance of the evidence that the harm was caused after the product's 'useful safe life' had expired." RCW 7.72.060(1). The statute also provides that "'Useful safe life' beings at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner." RCW 7.72.060(1). The statute creates a presumption: "If the harm was caused more than twelve years after the time of delivery [of the product], a presumption arises that the harm was caused after the useful safe life had expired. This presumption

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

1  may only be rebutted by a preponderance of the evidence." RCW 7.72.060(2).

2      6.20   Monsanto's PCBs were installed in the school from the 1950s through the

3  1970s. Although the PCB-caulking and PCB-light ballasts continued to have *useful*

4  product lives up to the time of remediation in 2016, the PCBs themselves never had *safe*

5  lives due to their extreme toxicity. Monsanto knew that PCBs were toxic, but it provided

6  no adequate warnings. As a result, the public entity Defendants were left uninformed by

7  the manufacturer about the extent of the true dangers of PCBs. Up to the present day,

8  PCBs remained as toxic as they were when Monsanto produced and promoted them. By

9  the 1980s, the EPA termed PCBs "extremely toxic." The statute of repose requires a

10  product to have had a useful safe life when manufactured; the plain meaning of "safe,"

11  however, does not include "extremely toxic." Due to their extreme toxicity, Monsanto's

12  PCBs never had a safe life. PCBs are not and were not reasonably safe products. PCBs

13  were and still are unavoidably unsafe products. A defense that applies to products having

14  a "useful safe life" cannot and does not apply to PCBs.

15      6.21  **No "useful safe life" defense, the indefinite persistence of PCBs means**

16  **an indefinite "useful" life.** In the alternative, the chemical stability and persistence of

17  PCBs means they have an indefinitely long "useful" life. In the school, the PCB-light

18  ballasts continued to perform their functions for decades, in fact, until 2016 when they

19  were uninstalled. Likewise, the PCB-containing caulking continued to perform its

20  function of sealing gaps between walls, window frames, and masonry joints, until the

21  caulking was removed in 2016. The utility of the PCBs continued uninterrupted from the

22  time of their installation in the school until 2016, and the PCBs performed their functions

23  throughout that time. RCW 7.72.060(1) ("'Useful safe life' begins at the time of delivery

24  of the product and extends for the time during which the product would normally be

25  likely to perform…"). The product seller statute of repose provides Monsanto no defense

26  in this case.

27      6.22  **No "useful safe life" defense, statutory exception applies.** In the

28  alternative, if the Court finds that PCBs had a safe life, then a statutory exception applies

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

to deprive Monsanto of the defense. "A product seller may be subject to liability for harm caused by a product beyond its useful safe life if… The product seller intentionally misrepresents facts about its product, or intentionally conceals information about it, and that conduct was a proximate cause of the claimant's harm." RCW 7.72.060(1)(b). Monsanto has intentionally misrepresented facts about PCBs, or has intentionally concealed information about them, and that conduct was a proximate cause of Plaintiffs' harms. No "useful safe life" defense applies under this statutory exception.

6.23    **Statute of limitations.** For the Plaintiffs, the product liability claims did not accrue until spring of 2016, when environmental hygienists reported that Monsanto's PCBs contaminated the school buildings. RCW 7.72.060(3); *North Coast Air Services, Ltd. v. Grumman Corp.*, 111 Wn.2d 315, 759 P.2d 405 (1988); 16 Wash. Prac., Tort Law and Practice § 10:16 (4th ed.) (Oct. 2017 update) ("A three year discovery rule applies, with the provision that the statute begins to run when 'the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause.'"). "The Washington Supreme Court has held that this statute extends the limitations period beyond the time when the harm occurred in circumstances when the claimant would have no reason to know about the causal connection to a defective product." *Id.*, citing *North Coast Air Services, Ltd.*, 111 Wn.2d 315. Before spring of 2016, the Plaintiffs had no reason to know that any harm that occurred was caused by PCBs and that they were manufactured by Monsanto.

6.24    **Foreseeability.** For decades, Monsanto produced and promoted PCBs for a wide variety of applications, including building materials and fixtures such as caulking and light ballasts. Monsanto's PCBs were installed in the school between the 1950s and the 1970s. These building applications—and Monsanto's PCBs—are stable and durable. It was foreseeable that Monsanto's PCBs would be installed in schools, would persist up to the present day, and would harm people such as the Plaintiffs. This is due to several factors. The first is the stability and durability of PCBs, known to Monsanto. PCBs do not readily breakdown or decompose. This is one of their utilities and a reason that Monsanto

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

produced and promoted them.

6.25   The second is the known propensity of PCBs to migrate from their sources and contaminate the surrounding environment. Monsanto has known for several decades that PCBs migrate from their sources into their surrounding environments and harm the organisms that live in those environments. Over the years, the PCBs migrated from their sources in caulking and light ballasts into the surrounding building materials such as bricks, carpets, and library books, all of which are absorptive and act as a toxic "sink." As shown by the EPA, the toxic sink then acts as a secondary source of toxic exposure to occupants of the school, in addition to the ongoing primary sources of PCB exposure. In recent years, spikes in indoor air toxicity occurred due to PCB-light ballast failures in which PCB liquid dripped onto carpets and desks in classrooms, and in which failing PCB-light ballasts vented vapors and pyrolyzed byproducts such as dioxins and furans— which are highly toxic as well as foreseeable byproducts—into classroom air. The overall toxicity of the school gradually increased every year until 2016, when inspectors discovered the PCB contamination and the Health District ordered remediation.

6.26   The third factor making the persistence of PCBs foreseeable in the school is that Monsanto provided no warnings regarding their toxicity. Monsanto's knowing inaction made it more likely that the other Defendants would not act, causing more people, including school children, to become poisoned by Monsanto's PCBs. In short, it was foreseeable that Monsanto's PCBs would be left in place for decades in the school while contaminating it and slowly poisoning the people who use it.

6.27   It was also foreseeable that other people and entities may be negligent in their provision, maintenance, inspection, or supervision of the school, especially due to Monsanto's failures to warn. Any allegation by Monsanto of "misuse" of toxic PCB-containing products by other Defendants, third parties, or even the Plaintiffs, was a foreseeable "misuse" in part for this reason. Regardless, a product can be "not reasonably safe" even though the risk that it would cause the plaintiff's harm or similar harms was not foreseeable by the manufacturer at the time the product left the manufacturer's

FIRST AMENDED COMPLAINT FOR DAMAGES - 97

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

control. *See* WPI 111.02, -.03 (bracketed material). PCBs were not and still are not reasonably safe. Monsanto is strictly liable for Plaintiffs' damages.

6.28 **Missouri exemplary damages apply.** "Washington courts will apply the punitive damages law of other jurisdictions in product liability cases, if warranted under choice of law principles. In such a situation, the jury instructions on punitive damages should conform to the laws of the other state." 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.00 (6th ed.), citing *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143-44, 210 P.3d 337 (2009). Under a choice of law analysis, the Missouri law of punitive damages applies because Monsanto's reckless decisions and reprehensible conduct took place at Monsanto's headquarters in Missouri. In products liability cases under Missouri law, exemplary or punitive damages are available "if the defendant had actual knowledge of the defect and the danger and showed complete indifference or conscious disregard for the safety of others by selling the product anyway." 34 Mo. Prac., Personal Injury and Torts Handbook § 5.4 (2017 ed.), ¶ 17(e). Monsanto produced and promoted PCBs, an unreasonably dangerous product, with actual knowledge of their dangers. *Id.* at ¶ 11. Monsanto knowingly concealed the hazards of its PCBs and marketed them as safe for open and closed applications in order to maximize Monsanto's profits from PCB sales. *See, e.g., City of San Jose v. Monsanto Co.*, 231 F. Supp. 3d 357, 366 (N.D. Cal. 2017) (denying Monsanto's motion to dismiss the claim for punitive damages on these facts while holding that the Cities stated a claim for public nuisance based on PCB contamination).

**F.   Public entity negligence.**

6.29 **No Title 51 immunity.** Neither public entity Defendant is an employer of the Plaintiff teachers and therefore is not entitled to claim immunity under Title 51. RCW 51.08.070; *Afoa v. Port of Seattle*, 176 Wn.2d 460, 482, 296 P.3d 800 (2013) (Port of Seattle liable in tort to injured worker employed by third-party employer). There are no express contracts or acts that show any of the Plaintiffs or the State recognized one as the employee and the other as the employer. *Hubbard v. Dept. of Labor and Indus.*, 198

FIRST AMENDED COMPLAINT FOR DAMAGES - 98

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Wash. 354, 88 P.2d 423 (1939); *Fisher v. City of Seattle*, 62 Wn.2d 800, 384 P.2d 852 (1963) (relationship of employer and employee cannot exist without consent of employee for purposes of workers compensation laws).

6.30 **Union High as landowner and school district.** According to Snohomish County tax assessor records, Union High School District No. 402 is the owner of the land occupied by the old Monroe Middle School, currently known as Sky Valley Education Center, and used by the Monroe School District. Union High is also a school district and is liable to Plaintiffs, although Union High is not an employer of any Plaintiff and cannot allege Title 51 immunity. Union High violated its statutory and common law duties to the Plaintiffs. The violations were a legal cause of damages to Plaintiffs. Union High failed to maintain safe premises, violated common law and statutory duties to maintain a safe workplace, and is jointly and severally liable with the other Defendants to the Plaintiffs. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 482, 296 P.3d 800 (2013); *Afoa v. Port of Seattle*, 198 Wn. App. 206, 393 P.3d 802 (2017). Discovery and legal research may reveal more violations.

6.31 **Standing of the Snohomish Health District.** The Health District shall be liable for damages arising out of its tortious conduct. RCW 4.96.010; RCW 4.08.120 ("An action may be maintained… for an injury to the rights of the plaintiff arising from some act or omission of such county or other public corporation."); RCW 39.50.010(c).

6.32 **Health District's direct liability for negligence.** The Health District shall be liable for its own failures to hire, train, or supervise its employees in the performance of the duties of inspection and enforcement of minimal environmental safety requirements for the school buildings. *Id.*; Restatement (Second) of Agency, § 213(a).

6.33 **Health District's vicarious liability for negligence.** Any negligence of a Health District board member, administrator, or employee within the scope of his or her authority is the negligence of the Health District. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.03 (6th ed.) (modified).

6.34 **Health District's obligation to enforce safety requirements in the**

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

**school.** The Defendant Snohomish Health District has an obligation to protect public health in school buildings in Snohomish County. To protect public health, the State Board of Health shall establish safety requirements for water quality, air quality, and environmental conditions in school buildings, "including but not limited to heating, lighting, ventilation, sanitary facilities, and cleanliness." RCW 43.20.050(2)(d). The Snohomish Health District shall enforce these requirements. RCW 43.20.050(5). The requirements are designed for the benefit and protection of the children and adults who use public school buildings. *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987) (noting one exception to the public duty doctrine is "when the terms of a legislative enactment evidence an intent to identify and protect a particular and circumscribed class of persons (legislative intent)").

6.35 **Health District's duty to inspect school buildings.** The Health District must inspect schools and enforce safety requirements to prevent injury and to protect the children and adults, including the Plaintiff teachers, who use the school buildings.

6.36 **Health District's duty to take corrective action and enforce safety requirements.** The Health District must take corrective action and enforce safety requirements in school buildings to prevent injury and to protect the children and adults who use the school buildings.

6.37 **Health District breached its duties to the Plaintiffs, causing them harm.** For years, the Health District knew that the school violated environmental safety requirements. For those same years, the Health District had a duty to inspect, verify compliance, and order compliance with environmental safety requirements at the school. But the Health District failed to enforce compliance until the spring of 2016, by which time many people, including the Plaintiffs, had suffered toxic poisoning. In addition, the Health District knowingly and negligently delayed enforcement and waited while dozens of people reported illnesses and diseases attributed to the toxic school. The Health District chose not to act until 2016, when it finally ordered environmental testing and remediation of the hazardous substances in the school. The Health District's violations of

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA  98101
(206) 501-4446

its duties were legal causes of harm to the Plaintiffs.

6.38   The Health District is liable to the Plaintiffs and other reasonably foreseeable occupants of the school buildings for the toxic exposures that caused them harm. *Campbell v. City of Bellevue*, 85 Wn.2d 1, 530 P.2d 234 (1975) (duty imposed on electrical inspector who knew of nonconforming electrical system but failed to enforce electrical code compliance, causing injury and death); *Halvorson v. Dahl*, 89 Wn.2d 673, 574 P.2d 1190 (1978) (claim may be made against city for its long-term knowledge of, and inadequate response to, hotel's noncompliance with safety codes); *Bailey v. Town of Forks*, 108 Wn.2d 262, 737 P.2d 1257 (1987) (liability against police officer who allowed drunk driver to drive his truck, hitting motorcyclist). When the Health District finally acted in 2016 on the school buildings, it found "[t]he existence of unsafe conditions which present a potential hazard to occupants of the school [which] are in violation of these regulations." WAC 246-366-140(1); RCW 43.20.050 (health district shall enforce minimum safety requirements in school buildings); *Swank v. Valley Christian School*, 188 Wn.2d 663, 398 P.3d 1108 (2017) (holding that a statute enacted to protect student safety created an implied remedy for violations of the statute). The same "unsafe conditions" had been present for months, years, and decades beforehand, had harmed the children and adults in the school, and had been known to the Health District. The Health District's failure to enforce the safety requirements at the school buildings was a proximate cause of Plaintiffs' damages.

**G.   Roes.**

6.39   Roes 1 through 10 are public entities or public or private corporations who may be liable for causing injuries to the Plaintiffs. Currently, it is not known if named Defendants will allege fault against these entities or corporations. Plaintiffs request leave to amend this Complaint if Defendants allege fault against third parties, or if facts become known showing liability against third parties. Third parties Snohomish County, Northwest Education Service District #189, City of Monroe, EHS-International, and McKinstry Corp. are being given notice of this lawsuit. If they or another third party are added as Defendants,

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

the new claims in the amended pleadings relate back to the original complaint. CR 15(c).

**H.    Admonition of the *Environmental Defense Fund* decision**.

6.40    The federal district court for the District of Columbia advised that action must be taken to prevent toxic environmental poisoning and to protect future generations:

> We feel constrained to add one final note to emphasize our concern in this case. Human beings have finally come to recognize that they must eliminate or control life threatening chemicals, such as PCBs, if the miracle of life is to continue and if earth is to remain a living planet. This is precisely what Congress sought to do when it enacted section 6(e) of the Toxic Substances Control Act. Yet, we find that forty-six months *1287 after the effective date of an act designed to either totally ban or closely control the use of PCBs, 99% of the PCBs that were in use when the Act was passed are still in use in the United States. With information such as this in hand, timid souls have good reason to question the prospects for our continued survival, and cynics have just cause to sneer at the effectiveness of governmental regulation.

*Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1286-87 (D.C. Cir. 1980) (internal citation omitted).

**I.  Accountability.**

6.41    The Plaintiffs respectfully request that each of the Defendants be held accountable for their roles in causing the toxic poisonings in this case.

**VII.    PRAYERS FOR RELIEF**

**A.    Request for preservation of evidence.**

7.1    Plaintiffs request that all Defendants and third parties given notice of this lawsuit preserve all evidence that may potentially be relevant.

**B.  Ex parte contact is prohibited.**

7.2    Plaintiffs request that defense attorneys instruct their agents, employees, defendant employees, and defendants' agents to please refrain from any ex parte contact with Plaintiffs regarding the subject matter of this lawsuit, whether in school buildings, hospitals, or other locations. This request includes the non-physician State or University of Washington Medical Center employee(s) who have observed or attempted to observe clinical evaluations of injured Sky Valley teachers.

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA  98101
(206) 501-4446

C.   **Limited waiver of physician-patient privilege.**

7.3     Under RCW 5.60.060(4)(b), Plaintiffs hereby waive the physician-patient privilege only insofar as necessary to place damages at issue at the time of trial. Plaintiffs' actions do not constitute a waiver of any of their constitutional or statutory rights. Defendants, defense attorneys, and their agents are not to contact any treating physicians without first notifying plaintiff counsel, so the matter may be negotiated or brought to the attention of the Court. *Loudon v. Mhyre*, 110 Wn.2d 675 (1988); *Smith v. Orthopedics International, Ltd., P.S.*, 170 Wn.2d 659 (2010).

D.   **Motion practice.**

7.4     Plaintiffs will request relief during litigation through stipulation or motion practice for a limited protective order to provide appropriate psychological, privacy, and personal identification information protections for Plaintiffs.

7.5     Plaintiffs may request leave to amend the complaint, as discovery or Defendants' answers may require.

7.6     Plaintiffs may request leave to reform the caption to reflect the addition or deletion of parties.

7.7     Plaintiffs may request other relief as may be appropriate during litigation.

E.   **Judgment for damages.**

7.8     Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally, for monetary damages to make Plaintiffs whole, together with interest, expenses, costs of suit, attorney fees, as appropriate, and all such other relief as the Court deems just and proper, including:

      a.     Full compensatory damages to the Plaintiffs for past, present, and future general damages as allowed by law;

      b.     Full compensatory damages to the Plaintiffs for past, present, and future special damages as allowed by law;

      c.     Exemplary or punitive damages against Monsanto, Solutia, and/or Pharmacia, under the applicable law of foreign jurisdiction(s); and

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

d.    All other damages allowed by law, rule, or equity.

DATED this 3rd day of December, 2018.

FRIEDMAN │ RUBIN PLLP

By: _____
    Sean J. Gamble, WSBA No. 41733
    James A. Hertz, WSBA No. 35222
    Richard H. Friedman, WSBA No. 30626
    Henry G. Jones, WSBA No. 45684

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT FOR DAMAGES - 104

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury according to the laws of the State of Washington that on this date I caused to be served the foregoing document via King County Superior Court Mandatory E-Service to the individuals listed below:

| PARTY | COUNSEL |
|---|---|
| **Monsanto Company Pharmacia LLC Solutia, Inc.** | **Jennifer L. Campbell**, WSBA #31703, jcampbell@schwabe.com,  Direct Tel:  206-689-3052<br>**Allison K. Krashan**, WSBA #36977, akrashan@schwabe.com,   Direct Tel:  206-689-1216<br>**Schwabe, Williamson & Wyatt, P.C.,** 1420 Fifth Avenue, Suite 3400, Seattle WA  98101<br>Staff cc:  Rebekah Davies:  rdavies@schwabe.com<br>             Kelly Hamilton:  khamilton@schwabe.com<br>             Wendy Larson:  wlarson@schwabe.com |
| | **Adam E. Miller**, admitted pro hac vice, miller@capessokol.com,  Direct Tel:  314-754-4810<br>**Capes Sokol,** 7701 Forsyth Boulevard, 12th Floor, St. Louis MO 63105<br>Staff cc:  Carolyn Mulligan:  mulligan@capessokol.com<br>             Siobhan Murphy: smurphy@capessokol.com |
| | **Thomas M. Goutman**, admitted pro hac vice, goutman@whiteandwilliams.com<br>             Direct Tel:  215-864-7057<br>**White and Williams,** 1650 Market Street, Suite 1800, Philadelphia PA 19103<br>Staff cc:  Jennifer Matthey:  mattheyj@whiteandwilliams.com |
| **Monroe School District No. 103 d/b/a Monroe Public Schools** | **Patricia K. Buchanan**, WSBA #19892, pkb@pattersonbuchanan.com,  Direct Tel:  206-462-6703<br>**Michael T. Kitson** WSBA #41681, mtk@pattersonbuchanan.com,  Direct Tel:  206-462-6774<br>**Haley E. Moore**, WSBA #48076, hem@pattersonbuchanan.com<br>**Patterson Buchanan Fobes & Leitch, Inc., P.S.,** 2112 Third Avenue, Suite 500, Seattle WA  98121<br>Staff cc:  Jennifer Friesen: jrf@pattersonbuchanan.com<br>             Kristen Keller: ktk@pattersonbuchanan.com<br>             Rachel Nelson: ran@pattersonbuchanan.com |
| | **Patrick S. Schoenburg**, admitted pro hac vice, pschoenburg@wshblaw.com, Direct Tel: 559-437-2860<br>**Wood Smith Henning & Berman**, 7112 N. Fresno Street, Suite 160, Fresno CA 93720<br>Staff cc:  Cathy Walker: cwalker@wshblaw.com |
| **Snohomish Health District** | **Christopher J. Kerley**, WSBA #16489, ckerley@ecl-law.com<br>**Evans, Craven & Lackie, P.S.**<br>818 W. Riverside, Suite 250, Spokane WA  99201  T: 509-455-5200   F: 509-455-3632<br>Staff cc: Donna Devore: ddevore@ecl-law.com |
| **Union High School District No. 402** | No appearance. |

DATED this 3rd day of December, 2018, at Bremerton, Washington.

_Mary Ann J. Blackledge_

Mary Ann J. Blackledge